# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Eugene Christopher Banks, | Civ. No. 11-1706 (MJD/JJK) |
| Plaintiff, | |
| v. | |
| Lucinda Jesson; Dennis Benson; Kevin Moser; Jason Goodwin; Thomas Lundquist; Julie Rose; Brian Ninneman; Kelli Hammond; Rob Liggett; Jeff Hines; Jack Leritz; Allison Collins, also known Allison Ecklund; Jessica M. Ranem; Leann Bergman; Amanda R. Furey; Andrea Maralee Kosloski; Jannine M. Hebert; Elizabeth J. Barbo; Darrel Jensen; Pam Sater; Tina Joseph; Carl Lundgren; Kevin Scanlon; Matt Dahl; Diane Haller, also known as D. Haller; Debbie Thao; and Jennifer Bonrud, also known as J. Bonrud, | **REPORT AND RECOMMENDATION** |
| in their Official and Individual Capacities; | |
| Defendants. | |

JEFFREY J. KEYES, United States Magistrate Judge

## INTRODUCTION

Plaintiff, a patient at the Minnesota Sex Offender Program ("MSOP"), in Moose Lake, Minnesota, initiated this § 1983 action in this Court against the above-named Defendants, claiming that they have violated his First, Fourth, and

Fourteenth Amendment rights under the U.S. Constitution because, among other things, he was denied access to various publications that were deemed to be prohibited under MSOP's media policy and his requests to buy and use various electronic devices were denied.  (Doc. No. 1.)   Thereafter, Defendants filed and served their motion for summary judgment, which is currently pending before this Court, and their supporting documents.  (Doc. Nos. 16–42.)

On September 9, 2011, Plaintiff filed a motion to amend Paragraph 16 of the Complaint to add additional claims and defendants.  (Doc. No. 46.)   This Court granted Plaintiff's motion and directed him to file his Amended Complaint as a matter of course by November 4, 2011.  (Doc. No. 56.)   Plaintiff timely filed his Amended Complaint on November 1, 2011.  (Doc. No. 57.)   Plaintiff amended Paragraph 16 of the Complaint to allege that a private entity known as Mediacom Communications Corporation, an employee of Mediacom, three MSOP employees, and two state employees from the Minnesota Department of Administration, entered into a contract for an obsolete television signal format and the filtering of certain television stations in violation of his First and Fourteenth Amendment rights and in violation of the FCA and RICO.  (*Id.*)   On December 15, 2011, Count 16 of Plaintiff's Amended Complaint was summarily dismissed.  (Doc. No. 61.)   The remaining counts of Plaintiff's Amended Complaint are the subject of Defendants' pending motion for summary judgment.

The matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation under 28 U.S.C. § 636 and Local Rule 72.1.  For

the reasons discussed below, this Court recommends that Defendants' motion

for summary judgment be granted in part and denied in part.

## BACKGROUND

In 1998, Plaintiff was found to be a "Sexually Dangerous Person" ("SDP"),

under Minnesota law.  *See* Minn. Stat. § 253B.02, subd. 18b.[1]  Based on that

determination, Plaintiff was civilly committed to the MSOP for an indeterminate

term.  Plaintiff was detained at the MSOP facility in Moose Lake, Minnesota, at all

times relevant to this action, and he remains confined there at this time.

Plaintiff recently sought to be discharged from the MSOP, but his request

was denied.  The evidence presented at the hearing on Plaintiff's discharge

petition showed that:

> MSOP has diagnosed [Plaintiff] with pedophilia, paraphilia, drug and
> alcohol abuse in a controlled environment, anti-social personality
> disorder, and narcissistic personality disorder.  Since being
> committed, appellant has refused to participate in sex-offender
> treatment.  [Plaintiff] has continued to engage in behavior indicating
> an interest in children, including possession of a picture of a naked
> child, possession of letters exploiting sexual violence and physical
> and sexual abuse of children, and communications with two different
> 15-year-old boys.  During virtually the entire time of his commitment,
> Plaintiff has threatened and assaulted MSOP staff.  In a report dated
> August 7, 2007, Plaintiff's treatment team at MSOP concluded that
> he is at high risk for reoffending because of his current level of
> psychopathy, continued sexual deviancy and rule violations in an
> institutional treatment setting, failure to participate in treatment,
> inability to identify his sex-offending risk factors, and the presence of

---

[1]     Minn. Stat. § 253.02, subd. 18b defines a SDP as "a person who: (1) has engaged in a course of harmful sexual conduct as defined in subdivision 7a; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 7a.

a large number of static risk factors.

*Banks v. Ludeman*, No. A08-2024, 2009 WL 1182314, at *1 (Minn. Ct. App. May 5, 2009), *rev. denied*, (July 22, 2009).

Plaintiff currently resides in the Omega or the Behavioral Therapy Unit ("BTU") at the MSOP.  (Aff. of Brian Ninneman ("Ninneman Aff.) ¶ 4.)   Detainees assigned to this unit have engaged in significant and ongoing criminal, disruptive, and assaultive behavior and often exhibit continuing behavioral problems.  (*Id.*) The BTU is different from other units in the MSOP in that it imposes a structured daily routine and limits interactions with other MSOP detainees.  (*Id.*)   On March 5, 2010, Plaintiff was also placed on an Individual Program Plan ("IPP").   (Doc. No. 27, Aff. of Debbie D. Thao ("Thao Aff.") ¶ 5.)  The IPP is used by clinicians to help identify, define, and decrease the repetitive behaviors that affect "a client's ability to successfully [sic] program."  (*Id.*)   Defendant Thao, clinical supervisor of the MSOP Behavioral Therapy Unit, states that Plaintiff's IPP was implemented because he continues to demonstrate difficulty in maintaining compliance with Unit guidelines and behavioral expectations of the Unit and MSOP.  For example, Plaintiff continues to refuse to comply with MSOP's 2x3 wall space limitation policy and with the Fire Marshalls' directive regarding combustible materials in MSOP detainees' rooms.  (*Id.* ¶ 6.)  Plaintiff also does not meet the MSOP's expectations of maintaining appropriate hygiene in his room and in self-care. (*Id.*)   Plaintiff's IPP plan was last modified on June 23, 2011.  (*Id.* ¶ 8.)  To be removed from the IPP, Plaintiff must demonstrate compliance with the Unit rules

4

and behavioral expectations.  (*Id.* ¶ 9.)

In October 2008, Plaintiff commenced an action against several State Defendants under 42 U.S.C. § 1983, alleging the unlawful taking, loss, damage, and/or destruction of his personal property.   *Banks v. Ludeman*, Civ. No. 08-5792 (MJD/JJK) (D. Minn. 2008). The parties eventually entered into a settlement agreement in which Plaintiff, in exchange for a payment of $1,400.00, released the Defendants:

> . . . in their official and individual capacities, and the State of Minnesota, DHS, and MSOP, including their employees, officials, and agents, from any claim, cause, right, or liability that Plaintiff Banks may have against them, whether or not known at this time, in any way relating to or arising out of the litigation.

(Doc. No. 19, Aff. of Ricardo Figueroa ("Figueroa Aff.") ¶ 5, Ex. A.)  The settlement agreement was executed on January 19, 2011, and the case was dismissed with prejudice on January 24, 2011.  *See Banks*, 08-5792, Doc. No. 96.

Plaintiff commenced the present § 1983 action in June 2011.  (Doc. No. 1.) He is attempting to sue numerous employees of the State of Minnesota, who are involved in the MSOP.   Seven of the named Defendants work in supervisory capacities (collectively "the Supervisory Defendants") including:  (1) Lucinda Jesson, the Commissioner of the Minnesota Department of Human Services; (2) Dennis Benson, the Executive Director of MSOP; (3) Elizabeth J. Barbo, the Acting Assistant Director of the MSOP; (4) Brian Ninneman, the BTU Director at MSOP; (5) Jannine M. Hebert, the Executive Clinical Director of the MSOP; (6)

Thomas Lundquist, the Clinical Director of the MSOP; and (7) Kevin D. Moser, the Acting Director of the MSOP.   The remaining Defendants work more directly with MSOP patients, including Plaintiff.

Plaintiff's current lawsuit stems from a series of confrontations between Plaintiff and various MSOP staff members, which occurred at the MSOP facility in Moose Lake between 2008 and 2011.  On several occasions that are described in Plaintiff's Complaint, MSOP staff members allegedly seized, or threatened to seize, items of Plaintiff's personal property that were considered to be "contraband" under MSOP regulations.  Many of the items at issue were magazines, catalogs, or videos that allegedly contained pictures deemed to be sexually provocative.  Other items were deemed to promote escape or illegal activities.   Yet other incidents cited in the Complaint involve the MSOP's refusal to allow Plaintiff to purchase certain computer or electronic devices for Plaintiff or to allow him to store certain information in a particular medium.

Most of the items at issue in this case—i.e., the various publications and materials that the MSOP staff took, or threatened to take, from Plaintiff—were deemed by the staff to violate (or possibly violate) the MSOP regulations, including the MSOP's Media Policy, that are intended to foster a safe and therapeutic environment at MSOP.  The MSOP Media Policy was created pursuant to Minn. Stat. § 246B.04, subd. 2, which requires that:

> The commissioner [of the Minnesota Department of Human
> Services] shall prohibit persons civilly committed as sexual
> psychopathic personalities or sexually dangerous persons under

> section 253B.185 from having or receiving material that is obscene
> as defined under section 617.241, subdivision 1, material that
> depicts sexual conduct as defined under section 617.241,
> subdivision 1, or pornographic work as defined under section
> 617.246, subdivision 1, while receiving services in any secure
> treatment facilities operated by the Minnesota sex offender program
> or any other facilities operated by the commissioner.

(Doc. No. 19, Figueroa Aff. ¶ 5, Ex. D.)  The Media Policy states that it is

intended to:

> provide a therapeutic living environment for patients in the [MSOP]
> that enhances their rehabilitation, to provide a safe and secure
> environment for all persons in MSOP facilities, and to comply with
> the provisions of Minnesota Statutes section 246B.04, subdivision 2,
> by restricting patients from possessing obscene, pornographic, or
> other prohibited materials in a way that is consistent with the
> constitutional rights of civilly-committed patients.[2]

(*Id.* at 1.)[3]

The Media Policy includes a "General Statement" section that expressly

acknowledges the First Amendment rights of MSOP patients.  (MP at 1 ("Civilly

committed patients retain their First Amendment rights, unless those rights are

restricted for important and specified treatment or safety reasons.").)  The Media

Policy also includes a "Procedures" section that establishes three categories of

---

[2]   The MSOP's current media policy, enacted in 2007, was a result of the
settlement in the *Kruger* litigation and incorporates the terms of that settlement.
*Ivey v. Mooney*, Civil No. 05-2666 (JRT/FLN), 2008 WL 4527792, at *1–2 (D.
Minn. Sept. 30, 2008)

[3]   All future references to the Media Policy will be cited as ("MP at __.").

materials: (1) "Prohibited Materials"; (2) "Counter-Therapeutic Materials"; and (3) "Permitted Materials."  (MP at 2–3.)

Prohibited materials are items that MSOP patients are strictly forbidden to possess.  Such items include "obscene materials" as defined by Minnesota statutes, illegal materials like child pornography, and pictures and videos that either display "human genitalia in a lewd and explicit fashion," or are otherwise sexually provocative.  (MP at 2.)

Counter-therapeutic materials are items that are not strictly prohibited, but are antithetical to the rehabilitation of either (a) the particular patient who possesses the item, or (b) a significant number of other patients who might encounter the item.  Such counter-therapeutic items include "[m]aterials depicting nudity, sexual contact, sadomasochistic abuse, masturbation or excretory functions."  (MP at 3.)  MSOP patients are discouraged from possessing counter-therapeutic materials, but they are allowed to do so.  If a patient elects to retain an item that is counter-therapeutic, that decision is noted in his records.  (MP at 3.)  "Permitted materials" are items that are not classified as either prohibited or counter-therapeutic.  (MP at 3.)

The MSOP has a "Media Review Team" ("MRT") that evaluates items that could be viewed as contraband under the Media Policy.  The MRT consists of "[d]esignated staff members who are trained . . . to assess reading materials, pictures and videos."  (MP at 1.)  The procedure for identifying contraband that is subject to the Media Policy is summarized as follows:

Reading materials and pictures are scanned for content by MSOP staff members upon arrival.  In addition, patient computers, media, media equipment and other possessions are subject to searches to ensure compliance with this procedure.  Items suspected of containing prohibited or counter-therapeutic material will be reviewed by the Media Review Team to determine whether they contain prohibited or counter-therapeutic material.  The Program Administrator, Clinical Director and/or their designees will make the final determination as to the classification of material when requested to do so by the Media Review Team or the patient.

(MP at 3.)  The Media Policy also includes an appeal process.  A patient who wants to challenge an MRT decision is required to file a formal written grievance and no confiscated materials are destroyed or consequences imposed pending the outcome of the grievance process.  (MP at 5.)

After an item is finally determined to be "prohibited," the affected patient is given ten business days to destroy it, send it to someone outside of the MSOP, or make arrangements to have it picked up by someone who will take it away from the MSOP.  (Doc. No. 26, Aff. of Leann M. Bergman ("Bergman Aff.") ¶ 6.)  If the patient does not properly dispose of a prohibited item, it will be destroyed by the MSOP staff.  (*Id.*)

The MSOP also has a Contraband Policy, 301.030, to ensure a safe, secure, and therapeutic environment by identifying, prohibiting and responding to contraband at the MSOP.  (Figueroa Aff. ¶ 3, Ex. B at 1.)   Contraband is defined as any item that is prohibited by statute or policy, or "deemed to create a risk to safety, security or therapeutic environment impacting the program or client."  (*Id.*)

The list of items considered contraband include, but are not limited to, escape

paraphernalia, and other items that teach, describe, or contain plans for activities

in violation of program rules, escape, or other criminal activity, personal

computers, personal data storage devices, prohibited media as outlined in MSOP

Procedure 06603, excessive amounts of authorized items or possessions,

including items in excess of allowable personal items, and articles suspected or

determined to be contraband by the Allowable Items Committee.  (*Id.* at 2–3.)

As noted above, the MSOP staff confronted Plaintiff about suspected

contraband on many occasions.  Some items were seized from Plaintiff and

destroyed; some items were seized and sent away from the MSOP; and some

items were seized, but later returned to Plaintiff.   Plaintiff also made various

purchase requests for computers, game stations, and other electronic media,

which the MSOP denied because MSOP policy forbids the personal possession

of these items.   In the present lawsuit, Plaintiff claims that Defendants violated

his federal constitutional rights during the various incidents described in his

Amended Complaint, including his right to free speech under the First

Amendment, his right to protection from unreasonable searches and seizures

under the Fourth Amendment, and his right to due process under the Fourteenth

Amendment.

## DISCUSSION

**I.      Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment

shall be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion.  *Id.* at 255.

## II.    Analysis

Before this Court addresses the various affirmative defenses raised by Defendants, it will review Plaintiff's numerous claims of constitutional violations to determine whether summary judgment should be granted dismissing claims that fail as a matter of law.

**A.    Claims to be Dismissed Because No Triable Issue That Plaintiff's
Constitutional Rights Were Violated**

**1.    Paragraph 2 – "Alec Sloth's:  From Here to There";
Paragraph 3 – "Artists"; Paragraph 28 – "Photo District News Photo",
Issue 6; Paragraph 14 - "Black and White" Issue No. 83; Paragraph 39
- "Nudism Lifestyle"; Paragraph 1 – "The Passport Book:  The
Complete Guide to Offshore Residency, Dual Citizenship and Second
Passports"; "The Sovereign Society"; "Wealth Mastery Program";
Paragraph 20 – "Explore Minnesota Book and Map"; Paragraph 19 -
"Harper's Bazaar" May 2011 Issue; Paragraph 30 – Letter from
Children International with Stickers; Paragraph 31 – Sheets of
Stickers**

Plaintiff claims that Defendants violated his constitutional rights by

confiscating the above media items or publications.   Defendants filed separate

affidavits setting forth the reasons for the items' seizures, and explaining why

each of these items violated MSOP's media policy or other policies prohibiting

contraband. As to Alec Sloth's photographs, Defendant Ranem forwarded the

book to the MRT—Defendants Hines and Ligget—who determined the book to

be "prohibited contraband because it contained nudity including clearly visible

genitals."  (Doc. No. 38, Aff. of Jessica M. Ranem ("Ranem Aff.")  ¶ 4; Doc. No.

37, Aff. of Robert D. Liggett ("Liggett Aff.")  ¶ 3; Doc. No. 28, Aff. of Jeffrey L.

Hines ("Hines Aff.")  ¶ 3.)   The "Artists" publication was sent to the MSOP's MRT

by Defendant Jensen.   (Doc. No. 29, Aff. of Darrel E. Jensen ("Jensen Aff.") ¶ 5.)

Defendants Hines and Leritz reviewed the magazine and determined that it was

prohibited under the MSOP's media policy because it contained three pages of

female nudity with clearly visible genitals.   (Hines Aff. ¶ 5; Doc. No. 39, Aff. of

Jack A. Leritz ("Leritz Aff.") ¶ 3.)   Defendant Rose, a clinician, upheld this MRT's

determination because the magazine contained photographs that predominantly and prominently displayed nudity, including clearly visible female genitals.   (Doc. No. 34, Aff. of Julie A. Rose ("Rose Aff.") ¶ 4.)  MSOP clinician Collins determined that the "Photo District News Photo," Issue 6 contained prohibited images, including an image of a completely nude woman with exposed breasts including nipples.   (Doc. No. 40, Aff. of Allison M. Collins ("Collins Aff.") ¶ 8.)   As to the "Black and White," No. 83 publication, Defendant Hines stated that it had eleven pages of female nudity, including visible breasts.   (Hines Aff. ¶¶ 8–9.)  Hines was uncertain whether this magazine was prohibited, so he sent it to the clinician, Defendant Rose, who determined that the magazine was prohibited because it contained these eleven pages of images of nude females, most of which had visible breasts.   (Rose Aff. ¶ 6.)  With respect to the "Nudism Lifestyle" magazine, Defendant Rose also determined that the "Nudism Lifestyle" magazine was prohibited media because it contained pictures of males, females, and minor children that were fully or partially nude, with clearly visible genitals.   (*Id.* ¶¶ 7–8.)  And Defendant Collins reviewed the "Harper's Bazaar" May 2011 issue and determined that it contained prohibited images of a woman with exposed breasts and nipples.  (Collins Aff. ¶¶ 3–4.)

With respect to "The Passport Book:  The Complete Guide to Offshore Residency, Dual Citizenship and Second Passports"; "The Sovereign Society" book and the "Wealth Mastery Program" DVD, Defendant Furey stated that she initially secured the items "as being suspected contraband under the MSOP

Contraband Policy, which prohibits items that are 'escape paraphernalia and any other item that teaches, describes or contains plans for activities in violation of program rules, escape or other criminal activity" and then forwarded these materials to the Allowable Items Committee ("AIC") for review.   (Doc. No. 35, Aff. of Amanda R. Furey ("Furey Aff.") ¶¶ 4, 5.)   The AIC reviewed these items and determined that they were prohibited under the MSOP policy because they discussed how to set up offshore accounts and how to move your assets overseas.  (Doc. No. 36, Aff. of Andrea M. Kosloski ("Kosloski Aff.") ¶¶ 3–4.) There was also a reference to dual citizenship and how to obtain dual passports as well as how to obtain offshore residency.  (*Id.*)  Defendant Kosloski stated that Plaintiff was sent a contraband notice to which he did not respond and that the items were therefore destroyed.  (*Id.* ¶ 5.)  Similarly, the map of Minnesota and "Explore Minnesota" handbook were determined to be contraband because "the clients could use an area map to assist with an escape."  (*Id.* ¶ 7.)

As to the letter from Children International with stickers in Paragraph 30, Defendant Hattenberger stated that Plaintiff received from Children International a letter with stickers attached.   (Doc. No. 32, Aff. of Daniel J. Hattenberger ("Hattenberger Aff.") ¶ 3.)  Stickers are not allowed under the MSOP's Property Policy "as stickers are known to have been used to smuggle in other forms of contraband, like drugs."  (*Id.* ¶ 4.)   Plaintiff did not respond to the contraband notice by the required date, so "the item was destroyed, per policy on June 10, 2011."  (*Id.* ¶ 5.)   The same is true with respect to the nine sheets of stickers

14

referred to in Paragraph 31.  Defendant Scanlon removed these stickers from Plaintiff's room because the MSOP Allowable Property list does not permit detainees to have stickers because of the risk of drug smuggling.  (Doc. No. 31, Aff. of Kevin M. Scanlon ("Scanlon Aff.") ¶ 4.)

Defendants have submitted sufficient evidence, unrebutted by Plaintiff, to establish that there is no triable issue as to any of these publications because Plaintiff has no viable claim that his constitutional rights under the First, Fourth, or Fourteenth Amendments were violated.  Plaintiff's First Amendment claims should be evaluated using the guidelines that the Supreme Court adopted in *Turner v. Safley*, 482 U.S. 78 (1987), in reviewing how the First Amendment rights of prisoners could be limited by prison regulations and policies.  The Court found that prisoners do not forfeit their First Amendment rights altogether by reason of their criminal convictions, but the rights of prisoners are necessarily subject to greater restrictions then the corresponding rights of non-prisoners.  *Id.* at 84–85.

This Court recognizes that the Plaintiff in this case is not a prisoner, but a civilly committed detainee.  However, the guidelines set by *Turner* were not tied directly to prisoners' criminal convictions, but to their institutionalization.  In other words, prisoners' First Amendment rights are subject to greater restrictions not because of their convictions *per se*, but because prison administrators need to be able to perform their duties safely and effectively.  Those same concerns are just as applicable in a civil commitment setting as in a prison setting.  *Revels v.*

*Vincenz*, 382 F.3d 870, 874 (8th Cir. 2004) ("Although an involuntarily committed patient of a state hospital is not a prisoner *per se*, his confinement is subject to the same safety and security concerns as that of a prisoner.").  Plaintiff's present custodians, like prison administrators, are engaged in "an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources." *Turner*, 482 U.S. at 85.  The factors that "counsel a policy of judicial restraint" when it comes to the management of prisons, apply the same way to the treatment of dangerous civilly committed sex offenders.  *Id.*  Therefore, the First Amendment claims of civilly committed individuals, such as Plaintiff, should be evaluated under the *Turner* guidelines.  *See Semler v. Ludeman*, Civil No. 09-732 (ADM/SRN), 2010 WL 145275, at *8 (D. Minn. Jan. 8, 2010) (applying *Turner* to MSOP patient's First Amendment claims); *see also Ivey*, 2008 WL 4527792, at *4 (applying a "modified version" of the "deferential test outlined in *Turner*" to a First Amendment claim brought by an MSOP patient); *see also Banks v. Ludeman*, No. 08-5792 (MJD/JJK), 2010 WL 4822892, at *9 (D. Minn. Oct. 4, 2010) (same).  We first review, in general, the MSOP policy of prohibiting or restricting certain types of publications and then the specific application of those policies to the prohibition of the publications that Plaintiff wanted to receive.

 *Turner* identified four factors that are to be considered when evaluating a detainee's First Amendment challenge to institutional regulations, policies, and practices:

  (1) whether there is a valid rational connection between the

> regulation and the legitimate government interest it purports to
> further; (2) whether the inmate has an alternative means of
> exercising his constitutional right; (3) the impact that accommodation
> of the inmate's right would have upon others, including inmates as
> well as non-inmates; and (4) the absence of a ready alternative to
> the regulation.

*Ortiz v. Fort Dodge Corr. Facility*, 368 F.3d 1024, 1026 (8th Cir. 2004).  The

plaintiff bears the burden of proving that the *Turner* criteria should be resolved in

his favor.  *Abdullah v. Gunter*, 949 F.2d 1032, 1035 (8th Cir.1991).

　　*Turner* first requires that there must be a "valid, rational connection"

between the restriction at issue and "the legitimate governmental interest put

forward to justify it."  482 U.S. at 89.   Here, the MSOP Media Policy advances

two legitimate objectives: 1) to create and maintain an atmosphere that is

conducive to the therapeutic goals of treating dangerous sex offenders; and 2) to

reduce the danger of sexual aggression toward other civilly committed patients or

staff members.  (Doc. No. 19, MP at 1.)  These two interests—rehabilitation and

security—certainly constitute legitimate governmental interests.  *Dawson v.

Scurr*, 986 F.2d 257, 260 (8th Cir. 1993).  Defendants further contend that the

restrictions on counter-therapeutic materials, which are prescribed by the MSOP

Media Policy, are rationally related to the stated objectives of rehabilitation and

security.  This Court agrees.

　　Plaintiff has not come forward with anything to rebut the sensible

proposition that displaying images of nude females with visible genitals or

breasts and nude children to sex offenders is detrimental to a sex offender's

rehabilitation, and inimical to institutional security, and thus it is reasonable to restrict such displays.  Thus, this Court accepts Defendants' assertion that restricting the open display of nude female images is rationally related to the MSOP's legitimate interests in rehabilitating sex offenders, and providing a safe environment for the MSOP staff and patients.  *See Bahrampour v. Lampert*, 356 F.3d 969, 976 (9th Cir. 2004) (citing evidence showing "a rational connection between the availability of sexually explicit materials and harmful inmate behavior such as rape and other forms of sexual predation")*; Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999) (noting that "inmates have used nude photographs to draw anatomical comparisons with the wives, girlfriends and mothers of other inmates, which in turn led to fights and disturbances by the inmates and created a security risk for both inmates and jail employees; to draw anatomical comparisons between the female detention officers and the persons depicted in the photographs; and to openly masturbate in front of and otherwise sexually harass the female officers"); *Wickner v. McComb*, Civil No. 09-1219 (DWF/JJK), 2010 WL 3396918, at *5 (D. Minn. July 23, 2010) (finding "that there is a rational connection between" a prison policy barring inmates from possessing nude images "and the legitimate penological interests in maintaining prison security, rehabilitating sex offenders, and reducing sexual harassment of prison guards"). This is especially true where, as here, Plaintiff resides in the Omega unit of the MSOP, which houses individuals with significant and ongoing disruptive, assaultive, and criminal conduct.  This Court also concludes that the search and

seizure of items that may be used for purposes of escape, illegal activity, or drug trafficking closely tracks the MSOP's legitimate interest in institutional security and confinement of dangerous sex offenders.

The second *Turner* factor "is whether there are alternative means of exercising the right" at issue.  482 U.S. at 90.  This Court finds that there are alternative means of exercising Plaintiff's rights because "Plaintiff [ ] may still receive non-prohibited media."  *Semler*, 2010 WL 145275 at *10.  For example, MSOP's media policy does not ban all nudity, but rather only close-up photographs of "human genitalia of a lewd and explicit fashion" or material that "predominantly and prominently display nudity, and have the primary purpose of sexual arousal."   As to the remaining media items, Plaintiff is not prohibited from access to all materials relating to "wealth management," travel, and the like, but only to those items that can be used for purposes of escape or other illegal activity.   Therefore, this Court finds that Plaintiff has not satisfied his burden with regard to the second *Turner* factor.

As to the third *Turner* factor, this Court concludes that accommodating Plaintiff's expectations, by allowing inmates to possess the type of images at issue, would have a substantial, and very negative, "ripple effect" on the staff and patients at the MSOP.  Further, the third *Turner* factor requires the Court to be "particularly deferential" to the MSOP's concerns about the "ripple effect" of Plaintiff's publication requests.  *See Turner*, 482 U.S. at 90 ("[W]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow

inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials."  With such deference in mind, this Court finds that the third *Turner* factor weighs heavily in favor of Defendants.

The fourth *Turner* factor requires this Court to consider whether there are any "ready alternatives" to the regulation at issue, which would allow Plaintiff to exercise his First Amendment rights as he wishes, without adversely affecting the objectives of the regulation.  This Court finds that there are no ready alternatives here.  As noted above, the MSOP has designed its Media Policy and other property restrictions so that patients could exercise their First Amendment rights to the greatest extent that is consistent with the MSOP's mission and responsibilities.   Based on the affidavits of the various Defendants at issue, this Court is satisfied that this principle was followed in their review process of the above publications.   And as noted above, the fact that Plaintiff currently resides in the Omega Unit, which is for individuals who exhibit  behavioral problems or negative behavioral tendencies further affects this analysis.  In sum, fourth *Turner* factor weighs in Defendants' favor.

Applying *Turner* to the items at issue here, this Court concludes that the MSOP Media Policy was applied in a manner that did not violate Plaintiff's First Amendment rights.  The prohibition of these materials bore a rational relationship to the therapeutic and security goals of the MSOP.  Defendants have submitted sufficient evidence, in affidavits in support of summary judgment, that the publications violated the MSOP Media Policy, and were seized for that reason.

Aside from his own self-serving allegations, Plaintiff provides no evidence to refute Defendants' affidavits in which Defendants describe how each of the subject publications violated the MSOP policies because they were prohibited materials.  Plaintiff has failed to establish "specific facts showing that there is a genuine issue for trial" as to these publications.  *Cf. Semler*, 2010 WL 145275 at *10 (rejecting MSOP detainee's First Amendment claim based on his request to possess nude photographs of a female friend after determining that the MSOP Media Policy, "as applied to the images in question, satisfies the *Turner* factors."); *Bahrampour*, 356 F.3d at 976 (citing evidence showing "a rational connection between the availability of sexually explicit materials and harmful inmate behavior such as rape and other forms of sexual predation")*; Mauro*, 188 F.3d at 1060 (noting that "inmates have used nude photographs to draw anatomical comparisons with the wives, girlfriends and mothers of other inmates, which in turn led to fights and disturbances by the inmates and created a security risk for both inmates and jail employees; to draw anatomical comparisons between the female detention officers and the persons depicted in the photographs; and to openly masturbate in front of and otherwise sexually harass the female officers"); *Wickner*,  2010 WL 3396918, at *5 (finding "that there is a rational connection between" a prison policy barring inmates from possessing nude images "and the legitimate penological interests in maintaining prison security, rehabilitating sex offenders, and reducing sexual harassment of prison guards").

Nor can Plaintiff sustain a Fourth Amendment claim based on the seizure of the items at issue.  The Fourth Amendment proscribes only *unreasonable* searches and seizures.  *Banks*, 2010 WL 4822892, at *13.  Given the prohibited nature of the above items, it was not unreasonable for the MSOP officials to remove these materials from the MSOP patient population.  No reasonable factfinder could conclude that it is "unreasonable" to seize such sexually explicit photographs from a civilly-committed sex offender who is confined, in company with other sex offenders, in an institution that is supposed to provide rehabilitative treatment.  The same is true of the materials that can be used for escape, illegal transactions, or drug trafficking.  Thus, this Court concludes, as a matter of law, that Plaintiff cannot sustain a Fourth Amendment claim based on the seizure of the above items.

In addition, this Court concludes that Plaintiff's "Fourteenth Amendment right to Due Process and his right to liberty" claims fail for several reasons.  With respect to Plaintiff's procedural due process, the Eighth Circuit has held that the nature of the constitutional rights of those committed to the MSOP "must therefore be understood in the context of that commitment and its accompanying restrictions."  *Semler*, 2010 WL 145275 at *23 (quoting *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006)).  To the extent that Plaintiff's claims implicate procedural due process, a procedural due process claim is reviewed in two steps.  *Senty-Haugen*, 462 F.3d at 886.  The Court must first determine whether Plaintiff was deprived of a protected liberty or property interest.  *Dover Elevator*

*Co. v. Ark. State Univ.*, 64 F.3d 442, 445–46 (8th Cir. 1995).  The protected

liberty interest may arise from either the due process clause itself or state laws.

*Kentucky Dep't. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).  If there is a

protected interest, the Court then considers what process is due by balancing the

specific interest that was affected, the likelihood that the applicable procedures

would result in an erroneous deprivation and the affected program's interest in

providing the process that it did, including the administrative costs and burdens

of providing additional process.   *Senty-Haugen*, 462 F.3d at 886 (citing

*Matthews v. Eldridge*, 424 U.S. 319, 332–35 (1976)).  Notably, however, the

Eighth Circuit has also recognized that the liberty and property interests of

persons committed to state custody as dangerous persons are "considerably less

than those held by members of free society."  *Senty-Haugen*, 462 F.3d at 886.

Therefore, due process requirements are flexible and specific to each particular

situation.  *Senty-Haugen*, 462 F.3d at 888.  "The most important mechanisms for

insuring that due process has been provided are 'notice of the factual basis'

leading to a deprivation and 'a fair opportunity for rebuttal.'" *Id.* (citing *Wilkinson

v. Austin*, 545 U.S. 209, 226 (2005)).

Here, given the nature of the materials in question, Plaintiff cannot show

that he had any protected property or liberty interest in the above publications,

electronics, and other media items.  In other words, Plaintiff has no protected

liberty or property interest in possessing personal items that are deemed

prohibited contraband by the MSOP, such as escape or drug paraphernalia.  *See*

*Ivey*, 05-1215 (JMR/AJB), 2006 WL 618110 at *6 (D. Minn. Mar. 9, 2006) (stating that there is no First Amendment right to possess what is essentially contraband).   And, as shown by Defendants' affidavits, Plaintiff was given notice of the MSOP's determination and an opportunity to challenge it before the items were taken away or disposed.   In sum, this Court concludes that Plaintiff's procedural due process claims as to the above publications should be dismissed.

Plaintiff fairs no better with his substantive due process claims.   First, even assuming Plaintiff actually invokes the Fourteenth Amendment substantive due process clause in his Complaint, that claim is effectively subsumed by the First Amendment claim, which is governed by the test announced in *Turner*, or the Fourth Amendment claim concerning unreasonable seizures.   That is because "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim."   *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotations omitted)); *Mattson v. Becker Cnty*, 07-1788, 2008 WL 3582781, at *5 (D. Minn. Aug. 12, 2008) (relying on *Albright*, 510 U.S. at 272 to find that "[a]lthough Mattson asserts this claim under the Fourteenth Amendment, it is better analyzed under the Sixth Amendment").   As discussed above, the evidence in this case does not support a First or Fourth Amendment claim against Defendants as to the above items.   Accordingly, Paragraphs 1, 2, 3, 14, 19, 20, 28, 30, 31, and 39 should be dismissed from this action.

### 2. Electronic Media, Computers, Games, Personal Property Space, and the like – Paragraphs 15, 22, 23, 24, 33, 34, and 40

In Paragraph 22 of the Amended Complaint, Plaintiff contends that his constitutional rights under the First, Fourth, and Fourteenth Amendments of the Constitution were violated when the "MSOP IT Department staff deemed all removable media devices such as computer DUD's, CD-R, diskettes, flash drives, ECT. [sic] as prohibited." (Am. Compl. ¶ 22.) However, the Acting Director of the MSOP has provided the following explanation of the program's computer policy that was revised in June 2010 to provide the clients with access to an internal client network for storing data that had previously been stored on the sort of removable media devices to which Plaintiff refers:

> All MSOP clients were given notice on July 18, 2010, concerning revisions to the Client Computer Policy. The Client Computer Policy was enacted in order to provide clients with access to an internal client network for storing data that had previously been stored on flash drives, DVDs, DVRs, and other kinds of computer media. Once the information that was previously on the computer media had been transferred onto the internal client network, these portable media were deemed prohibited as contraband. The only outside computer media that can come in currently is from an attorney or the court. Clients may sign up to use the internal client network during the open blocks of time that have been reserved by that client.

(Doc. No. 25, Aff. of Kevin D. Moser (Moser Aff.) ¶ 7.) This change in policy did not result in a violation of Plaintiff's constitutional rights. Plaintiff has no First Amendment right to store computer data on removable media devices such as a flash drive or diskette. The protections of the First Amendment do not extend this far. *See Ivey*, 2006 WL 618110, at *2, 6 (finding no First Amendment

violations where the MSOP detainee challenged policy preventing him from
scanning and storing documents on his personal computer).  Furthermore,
restrictions on computer privileges have been described as "*de minimis*
restrictions 'with which the Constitution is not concerned.'"  *Senty-Haugen*, 462
F.3d at 886 n.7 (quoting *Bell v. Wolfish*, 441 U.S. 520, 539 n.20 (1979)).  As far
as the Fourth Amendment claim is concerned, Plaintiff makes no allegation that
any property that he possessed was searched or seized; rather, his complaint is
that the MSOP staff has prohibited him from possessing the removable media
storage devices.  Thus, there is no viable Fourth Amendment claim because the
Fourth Amendment prohibits only unreasonable searches and seizures.  And
Plaintiff does not specify anything about his Fourteenth Amendment due process
claim.  Presumably, he is claiming that he has been denied due process in
connection with the decision of the MSOP staff to prohibit the removable storage
devices (in favor of storage of the data on the internal client network), but he
makes no suggestion as to what process was due but denied.

Plaintiff next claims, in Paragraph 23 of the Amended Complaint, that the
"I.T. Department Director refuses to even respond to and/or remove blocks from
unit computers so I can access E-mail and the internet/web."  (Am. Compl. ¶ 23.)
In Paragraph 24 he adds that Defendant Leann Bergman denied his request to
purchase a laptop and WIFI equipment "so I could access the web, email and
store paperwork on.  And not allowed vendor of choice."  (*Id.* ¶ 24.)  In his
Affidavit, Plaintiff states that this equipment would "increase safety by allowing

me a scan and save all my documents onto the computer hard drive which would

eliminate almost all combustible paper in my cell."   (Doc. No. 50, Aff. of Eugene

C. Banks ("Banks Aff.") ¶ 24.)  Plaintiff contends that these restrictions violated

his First Amendment right to free speech and his Fourteenth Amendment right to

due process.  Defendants respond by explaining that personal computers "are

not allowed in the facility due to security concerns with clients having personal

computers." (Doc. No. 26, Bergman Aff. ¶ 5.)  Defendants acknowledge that the

MSOP clients may not use the internal client network to access e-mail or the

internet, but explain that "this system allows for the orderly use of the internal

client network and will not allow clients to pressure other clients off the

computers when a client is using the computer within their allotted time frame."

(Doc. No. 25, Moser Aff. ¶ 7.)

     The problem with Plaintiff's claim that he was unconstitutionally denied

computer privileges—both the privilege to possess a personal computer of his

choice and to access the internet and e-mail—is that Plaintiff has no identifiable

constitutional right to possess or use a computer or have an email account or

internet access.   Although it would likely be more convenient for Plaintiff to

communicate with others through electronic rather than conventional mail, there

is nothing to indicate that the content of his speech was in any way limited by

these computer policies, so First Amendment speech concerns are not triggered.

The same is true with respect to internet access.  Further, internet access would

present additional administrative challenges for the MSOP staff in monitoring and

enforcing the ban on prohibited materials.  And Plaintiff does not have any liberty or property interest in gaining access to a computer that would trigger due process concerns.  *Sentry-Haugen*, 462 F.3d at 886 (stating that restriction on committed sex offenders computer privileges is the type of *de minimis* restrictions "with which the Constitution is not concerned") (quoting *Bell*, 441 U.S. at 539 n.20).  Thus, these MSOP computer policies do not violate Plaintiff's constitutional rights.

This Court reaches the same conclusion with respect to Plaintiff's claim that his constitutional rights under the First and Fourteenth Amendments were violated when MSOP staff refused to allow Plaintiff to buy an "X-Box 360 game system, Nintendo Wii/Fit game system, and PlayStation 3 game system"  (Am. Compl. ¶ 33) or a "radio Sirius XM satellite Model XMp 3i."  (Am. Compl. ¶ 15.)  As to each of these items, Defendants state that they are prohibited for security and/or therapeutic reasons.  For example, with respect to gaming systems, Defendant Moser describes why MSOP "clients" were prohibited from ordering new or used gaming consoles or replacement parts for the gaming systems they possessed as of July 5, 2011:

> This policy change is consistent with the MSOP policy of reasonably limiting the amount of personal property that MSOP clients may possess within their room because space limitations and security concerns dictate against allowing unlimited amounts of property, and controlling access to electronic devices such as gaming systems that could be used to smuggle in contraband and to view prohibited media in violation of the Media Policy and Contraband Policy.  In addition, clinical staff has raised concerns with clients spending too much time isolating themselves in their rooms playing on their

gaming systems and not engaging in pro-social and pro-treatment
activities.

(Moser Aff. ¶ 5.)  As in the case of personal computers, Plaintiff has no

constitutional right to electronic gaming systems or satellite radio devices.  First

Amendment concerns are not triggered because the ban on these devices is

obviously content neutral and Plaintiff has not come forward with any showing

that his free speech rights under the First Amendment are somehow substantially

abridged by not having access to these entertainment devices.  As far as the

Fourteenth Amendment is concerned, Plaintiff presents no information at all

about what process he was allegedly due but denied, and he has no fundamental

constitutional liberty or property interest in these gaming and entertainment

systems that would trigger close scrutiny of the MSOP's ban on their possession.

Plaintiff also complains about the MSOP's space-limitation policy that

provides that detainees have a 2x3 foot wall space "in which they may hang

pictures or wall hangings."  (Thao Aff. ¶ 7; Am. Compl. ¶ 34.)  Plaintiff contends

that this restriction violates his First and Fourteenth Amendment rights.  The

affidavit of Defendant Thao establishes that this restriction was imposed as a

matter of policy to comply with the Fire Marshall's order noting excessive

accumulation of combustible materials in client rooms.  (*Id.*)  This restriction does

not raise any First Amendment concerns.  It is obviously content neutral, as it

does not limit what Plaintiff may hang in the space.  As far as the Fourteenth

Amendment is concerned, Plaintiff has not identified any fundamental liberty

interest at stake in this *de minimis* restriction that would trigger substantive due process concerns, nor has he identified any procedural due process violation.

For many of the same reasons, Plaintiff fairs no better with his claim that Defendant Benson enacted a policy prohibiting him from receiving an education. (Am. Compl. ¶ 40.)  In his affidavit, Defendant Benson stated that he "has not enacted any policy, practice, or procedure at the MSOP that prohibits Mr. Banks from receiving an education."  (Doc. No. 20, Aff. of Dennis L. Benson ("Benson Aff.") ¶ 6.)   As discussed above, the June 2011 changes to the property policy limiting possession of various computer, gaming, and other electronic media did not infringe on Plaintiff's federal constitutional rights.   Accordingly, this Court recommends that Paragraphs 15, 22, 23, 24, 33, and 34, and 40 be dismissed against Defendants.

### 3.    Paragraph 21 – American Cheerleader

This Court finds that Plaintiff is unable to sustain the claims presented at Paragraph 21 of his Amended Complaint.  Plaintiff admits that the MSOP returned the "American Cheerleader" magazine to him (Doc. No. 57, Pl.'s Aff. at 13 of 18.)  Thus, this Court finds that Plaintiff could not sustain either a Fourth Amendment, a First Amendment, or a Fourteenth Amendment claim against Defendants based on the alleged seizure of these materials, and they are entitled to summary judgment on this claim.  Accordingly Paragraph 21 should be dismissed.

**4.     Paragraph 7 – Picture Advertisement Card from Church of Jesus Christ of Latter-Day Saints; Paragraph 18 – "Unclaimed Property and Supervised living facilities laws/rules"; Paragraph 26 – "Department of Administration Government Data Privacy" and "Office of Administrative Hearings Administrative Procedure"; Paragraph 32 – Letter and Photo;**

The record shows that the religious advertisement card was seized from Plaintiff because there was reason to suspect that it contained contraband material – there was a picture of a minor child there.   (Doc. No. 33, Affidavit of Carl E. Lundgren ("Lundgren Aff.") ¶¶ 3–4.)  But the card and picture were returned to Plaintiff after the clinician "determined there was no contraband found." (*Id.*)   The same is true of the letter and photo items contained in Paragraph 32 of Plaintiff's Amended Complaint.  According to the MSOP's records, the letter and photo secured on May 17, 2011 were returned to Plaintiff. (Figueroa Aff. ¶ 7, Ex. F.)   And the MSOP records indicate that Defendant Haller determined that the two books in Paragraph 18 titled "Department of Hearth Supervised Living Facilities and Unclaimed Property" were not contraband and that the books were on route to "client."  (Doc. No. 52, Sec. Aff. of Ricardo Figueroa ("Sec. Figueroa Aff.")  ¶ 2, Ex. A.)   Thus, summary judgment is proper on these claims.   The same is true of Plaintiff's claim as to the two books identified in Paragraph 26 of the Amended Complaint that were processed and sent to the MRT for review, but were inadvertently misplaced.  (Doc. No. 30, Aff. of Jennifer Bonrud ("Bonrud Aff.") ¶¶ 3–5; Doc. No. 42, Aff. of Anita Moonen ("Moonen Aff.") ¶¶ 2–4.)  Ms. Moonen states that as of August 26, 2011, she has

not received a lost property claim regarding these two items.  (Moonen Aff. ¶ 4.)

She confirms that "it appears that these books were inadvertently misplaced by

MSOP as I could not locate any documentation indicating the books were

returned to Mr. Banks or mailed out."  (*Id.*)  Based on the evidence presented

here—that the books were inadvertently misplaced by the MSOP—this Court is

satisfied that Plaintiff's claims in Paragraph 26 do not amount to a constitutional

violation of his rights.   *See Hall v. Chester*, 08-3235, 2008 WL 4657279, at *3 (D.

Kan. Oct. 20, 2008) ("[C]ourts have long held that the inadvertent, negligent

mishandling of an inmate's mail does not violate the Constitution") (citing *Bryant*

*v. Winston*, 750 F.Supp. 733, 734 (E.D. Va. 1990) (holding that an isolated

incident of mail mishandling, which is not part of any pattern or practice, is not

actionable under § 1983)); *Richard v. McDonnell*, 841 F.2d 120, 122 (5th Cir.

1988) (holding that negligent loss of mail does not amount to an actionable

constitutional violation).  In sum, Paragraphs 7, 18, 26, and 32 of Plaintiff's

Amended Complaint should be dismissed against any Defendant.

**B.**   **Claims that Should Not be Dismissed Because there are Triable Issues**

**1.      Paragraph 4 – "Photo District News", Issue 2; Paragraph 5 – "Interview"; Paragraph 6 – "Baby Love"; Paragraph 8 – "Color", Special Issue #13; Paragraph 9 – "Black and White" Issue No. 79; Paragraph 10 – "PDN" issue 10; Paragraph 11 – "Aperture"; Paragraph 12 – "W" Magazine, "Who's Hot January 2011";  Paragraph 13 – "W" Magazine, Oct. 2010 Issue; Paragraph 17 – "2011 MUI DVD Catalog"; Paragraph 25 – Metropolis; Paragraph 27 – " W" Magazine; Paragraph 29 – "Museum Store" fall/winter 2009/2010; Paragraph 35 – " A photographer's Life – 1990-2005"; Paragraph 36 – "Role Models in Photography"; Paragraph 37 – Polaroid Picture of stained and ripped linens; Paragraph 38 –  "Annie Leibovitz Women Susan Sontag"**

This Court concludes that summary judgment on this category of claims is not warranted because the record here is insufficient to show that there are no genuine issues as to any material fact relating to these allegations.   The problem here is that Defendants have not come forward with any evidence to show how any of these publications violated the MSOP's Media Policy or otherwise constituted contraband.  For example, Defendant Collins' affidavit confirms that she reviewed the "Museum Store" catalog and determined that it was prohibited and/or anti-therapeutic.  (Collins Aff. ¶ 9.)  But she does not recall why she determined that it was contraband.  (*Id.* ¶ 10.)  Similarly Defendant Bergman states that he responded to Plaintiff's request to appeal the contraband determination on a magazine titled "Baby Love" December 2010 issue by forwarding the item to Nate Johnson.  (Bergman Aff. ¶ 3.)  He states that he "did

not originally secure the item, nor [does he] know the outcome of the appeal."
(*Id.*)   Further, this Court finds nothing in Defendants' Affidavits, or any other part
of the evidentiary record, that describes the content of any of these publications,
or explains why they were found to be prohibited by the Media Policy or some
other MSOP regulation.   Defendants do not bother to include any affidavits
relating to many of the remaining items in this category, and when they do,
Defendants cannot recall anything about the items.   Thus, it is impossible for this
Court to assess whether these materials properly seized and/or destroyed.

It may be that the seizure and/or destruction of these items had been
entirely warranted under the Media Policy, and constitutional under *Turner* as
well, but Defendants have not yet substantiated that proposition.  This Court
cannot lose sight of the fact that it is dealing with the First Amendment rights of
civilly committed persons who have not forfeited all constitutionally protected
freedoms upon entering the commitment facility.  It is not too much to expect that
the state facility should keep a careful record showing why particular books,
magazines, newspapers, and pamphlets are refused or seized.  When dealing
with such important constitutional rights, this Court cannot simply assume, for
example, that a publication violates MSOP's policy against sexually explicit
materials or *Turner* just because it has a provocative title like "Baby Love."  And
this Court is certainly not going to jump to this conclusion when the publication is
a museum store catalogue.  That being the case, this Court cannot recommend
that the claims in Paragraphs 4, 5, 6, 8, 9, 10, 11, 12, 13, 17, 25, 27, 29, 35, 36,

37, and 38 (hereinafter the "remaining claims") be dismissed on summary judgment.

### C.    Qualified Immunity

Defendants assert they are entitled to qualified immunity from liability for all of Plaintiff's claims.  The doctrine of qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether the doctrine applies, this Court must determine whether: (1) there was a constitutional right violated; and  2) the right so clearly established at the time that a reasonable official in similar circumstances would know that his conduct violated the Constitution. *Vaughn v. Greene Cnty*, 438 F.3d 845, 850 (8th Cir. 2006).  The Court may answer either question first, depending on the facts of the case.   *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Here, this Court has determined, as described above, that many of Plaintiff's claims should be dismissed because no constitutional right was violated, so the Defendants will not face suit on those claims.  Defendants are not, however, entitled to qualified immunity from suit on the remaining claims. Defendants have not come forward with sufficient information from which this Court can decide, on summary judgment, whether Plaintiff's constitutional rights were violated when the publications were seized.  One of the obvious predicate

facts that must be determined at trial is whether the subject publication qualified as prohibited under MSOP's Media Policy because it contained, for example, the specific type of sexually explicit images banned by the policy. Until this is decided the Court cannot determine whether a particular Defendant's conduct violated clearly established constitutional rights known to a reasonable person.

### D.    Eleventh Amendment Defense

Plaintiff has sued Defendants in both their official and individual capacities. The Eleventh Amendment immunizes state officials acting in their official capacities from liability for damages under § 1983. *Morstad v. Dep't of Corr. & Rehab.*, 147 F.3d 741, 743 (8th Cir. 1998) (citing *Kentucky v. Graham*, 473 U.S. 159, 169 (1985)). Thus, all claims against Defendants for damages for actions in their official capacities with respect to the remaining claims should be dismissed. However, the Eleventh Amendment does not bar claims for prospective equitable relief against state employees acting in their official capacities, nor does it bar claims for damages against state employees acting in their individual capacities. *Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997). Therefore, this Court turns to the other defenses raised by Defendants to determine whether these claims should be dismissed.

### E.    Claims Against Supervisory Defendants

Based on the detailed record before it, this Court concludes that Plaintiff's claims against the Supervisory Defendants—Jesson, Benson, Moser, Lundquist, Hebert, Barbo, and Ninneman—should be dismissed because there is no

evidence that the Supervisory Defendants directed any of their subordinates to perform any acts giving rise to Plaintiff's lawsuit and were not otherwise involved in any of the purported violations of Plaintiff's rights that remain in the case.  (*See* Doc. No. 20,  Benson Aff. ¶¶ 4, 6; Doc. No. 21, Aff. of Elizabeth J. Barbo ("Barbo Aff.") ¶ 4; Doc. No. 22, Aff. of Brian S. Ninneman ("Ninneman Aff.") ¶ 5; Doc. No. 23, Aff. of Jannine M. Hebert ("Hebert Aff.") ¶ 4; Doc. No. 24, Aff. of Kevin D. Moser ("Moser Aff.") ¶ 4.)   Plaintiff has not submitted any evidence that contradicts this evidence provided in Defendants' affidavits.  Thus, the record shows that the Supervisory Defendants did not direct any of their subordinates to seize any of the items described in Plaintiff's Complaint, nor did they otherwise personally direct anyone to perform any of the actions giving rise to Plaintiff's lawsuit.   And no jury could reasonably determine that any one of the Supervisory Defendants was personally responsible for any violation of Plaintiff's constitutional rights.   Therefore, this Court recommends that summary judgment be granted in favor of the seven supervisory Defendants, and that this action be dismissed as to each of those particular Defendants.  For that reason, Paragraph 41 of Plaintiff's Amended Complaint should also be dismissed.

### F.    Retaliation Claims

In a prison setting, a retaliatory-discipline claim is sustainable only if a prisoner establishes that "'(1) the prisoner exercised a constitutionally protected right; (2) prison officials disciplined the prisoner; and (3) exercising the right was the motivation for the discipline.'" *Haynes v. Stephenson*, 588 F.3d 1152, 1155

(8th Cir. 2009) (quoting *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1119

(8th Cir. 2007)).  While recognizing once again that Plaintiff is not a prisoner, this

Court finds no good reason why this same three-prong analysis should not apply

to retaliatory-discipline claims brought by other state detainees, such as Plaintiff.

Applying the above analysis, this Court finds that Plaintiff cannot establish

a claim for retaliatory misconduct.  Plaintiff alleges in Paragraph 19 of the

Amended Complaint that Defendant Collins retaliated against him by writing up a

disciplinary report after he threatened to sue when Collins seized the Harper's

Bazaar magazine.  First, this Court has already determined that the seizure of

the "Harper's Bazaar" did not violate Plaintiff's constitutional rights because the

MSOP followed proper procedures in determining that this item violated the

MSOP Media Policy and was counter-therapeutic.  Thus, Plaintiff cannot satisfy

the first prong of retaliatory misconduct.  And Plaintiff cannot satisfy the third

requirement of a retaliatory discipline claim – i.e., he cannot show that exercising

his right to free speech was "the motivation for the discipline."

"To establish the third element of the prima facie case for retaliatory

discipline . . . an inmate must show that *but for a retaliatory motive*" he would not

have been disciplined.  *Haynes*, 588 F.3d at 1156 (emphasis added).  Here,

there is no evidence that the disciplinary measure taken by Defendant

Collins was in retaliation for a constitutionally protected form of expression.

Instead, the record shows that on May 12, 2011, the date in question, Plaintiff

was disrespectful in his response to a question by Defendant Collins, which

prompted the writing of an incident report.  (Collins Aff. ¶¶ 11–12.).  There is no

evidence that but for a retaliatory motive, Plaintiff would not have been

disciplined.  *See Banks*, 2010 WL 4822892 at *17.  Plaintiff thus cannot satisfy

the "but for" requirement of his retaliatory-discipline claim.

The same is true of Plaintiff's claim against Defendant Jensen in

paragraph 21 of the Complaint in which Plaintiff contends that the "American

Cheerleader" magazine was taken by Jensen to scare Plaintiff out of exercising

his constitutional rights.   As stated above, the "American Cheerleader" magazine

was returned to Plaintiff.  There is no evidence in the record—aside from

Plaintiff's bare assertions—that Defendant Jensen initially took the magazine to

harass and intimidate Plaintiff.  (Jensen Aff. ¶ 10.)  In sum, Plaintiff's retaliation

claims should not survive summary judgment.

### G.    Res Judicata Defense

Defendants argue that Plaintiff's claims in Paragraphs 4–6, 9–13, 17–18,

22, and 35–38, of the Amended Complaint are allegations of searches and

seizures that occurred prior to January 19, 2011.  (Doc. No. 18, Def.'s Mem. 6.)

Defendants further contend that the scope of the settlement agreement touches

upon the same subject as alleged in the paragraphs 4-5, 9–13, 17–18, and 35–

38 of the present Complaint in that he again sued the State and MSOP

employees for the alleged unlawful seizure and loss of various items that took

place prior to the effective date of the Settlement Agreement, and that these

claims are therefore barred by "a somewhat modified version of res judicata"

arising out of the parties' 2010 settlement agreement.  (*Id.* at 14.)   Plaintiff

objects to Defendants' res judicata defense.   Among other things, Plaintiff states

that he misstated the dates in Paragraphs 5, 6, 12, and 18.  The correct dates for

his claims, according to Plaintiff are: January 29, 2011 for Paragraph 5, February

10, 2011 for Paragraph 6, February 20, 2011 for Paragraph 12, and April 29,

2011 for Paragraph 18.  (Doc. No. 48, Pl.'s Resp. 2 of 4.)   Plaintiff also asserts

that "the Complaint # 17 is still being held pending return."  (*Id.*)  Plaintiff asserts

that the incidents involved in these claims all took place after the January 19,

2010 settlement agreement.   "As for Paragraphs 4, 9-11, 13, and 35-39," which

involve incidents that occurred between October 2008 and January 19, 2011,

Plaintiff claims that "it was my understanding and even stated by the state

attorney that those issues would half[sic] to be dealt with in a new suit because

they happened after the October 2008 file date.  So the state tricked me into the

agreement on those issues."  (*Id.*)

Based on the language of the parties' 2010 settlement agreement, the

record evidence, and Plaintiff's affidavit statements, this Court cannot conclude

that any of Plaintiff's claims is barred by res judicata as a matter of law for

purposes of summary judgment.   There are factual issues about the scope of the

release and the dates when the alleged seizures occurred that will have to be

resolved at trial.

## RECOMMENDATION

Based on the foregoing and all of the files, records, and proceedings

herein, **IT IS HEREBY RECOMMENDED** that:

1.     Defendants' Motion for Summary Judgment (Doc. No. 16), be

**GRANTED IN PART and DENIED IN PART**;

2.     Paragraphs 1, 2, 3, 7, 14, 15, 18, 19, 20, 21, 22, 23, 24, 26, 28, 30,

31, 32, 33, 34, 39, 40, and 41 of the Amended Complaint be dismissed;

3.     Defendants Jesson, Benson, Moser, Lundquist, Hebert, Barbo,

Ninneman, Furey, Ranem, Kosloski, Sater, Joseph, Thao, Goodwin, Haller, and

Liggett be dismissed from this action;

4.     The remaining Defendants' motion for summary judgment to dismiss

Paragraphs 4, 5, 6, 8, 9, 10, 11, 12, 13, 17, 25, 27, 29, 35, 36, 37, and 38 be

denied; and

5.     To the extent Plaintiff's claims for damages are asserted against

Defendants for action taken in their official capacities, those claims be dismissed.


Date:  January 13, 2012              *s/ Jeffrey J. Keyes*
                                     JEFFREY J. KEYES
                                     United States Magistrate Judge


Under Local Rule 72.2(b) any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**January 27, 2012** a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's

right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.