# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Eugene Christopher Banks,<br><br>         Plaintiff,<br>v.<br><br>Lucinda Jesson; Dennis Benson; Kevin Moser; Jason Goodwin; Thomas Lundquist; Julie Rose; Brian Ninneman; Kelli Hammond; Rob Liggett; Jeff Hines; Jack Leritz; Allison Collins, also known as Allison Ecklund; Jessica M. Ranem; Leann Bergman; Amanda R. Furey; Andrea Maralee Kosloski; Jannine M. Hebert; Elizabeth J. Barbo; Darrel Jensen; Pam Sater; Tina Joseph; Carl Lundgren; Kevin Scanlon; Matt Dahl; Diane Haller, also known as D. Haller; Debbie Thao; and Jennifer Bonrud, also known as J. Bonrud,<br><br>in their Official and Individual Capacities;<br><br>         Defendants, | Case No. 11-cv-1706 (SRN/JSM)<br><br><br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

Eugene Christopher Banks, *pro se*, MSOP-Moose Lake, 1111 Hwy 73, Moose Lake, MN 55767.

Aaron Winter and Max H. Kieley, Minnesota Attorney General's Office, 445 Minnesota St., Ste. 1100, St. Paul, MN 55101 for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Plaintiff Eugene Christopher Banks' self-titled

Appeal of the Report and Recommendation ("Plaintiff's Objection") [Doc. No. 64].

Plaintiff Banks objects to the Report and Recommendation ("R & R") dated January 13, 2012 [Doc. No. 62].  For the reasons set forth below, Plaintiff's Objections are overruled and the R & R is adopted in its entirety.

## I.      BACKGROUND

The facts and procedural history of this matter are accurately summarized in the R & R.  Plaintiff Eugene Christopher Banks ("Banks") does not object to this summary, but rather to some of the conclusions and recommendations of the R & R.  (See Pl.'s Obj.)  Thus, the Court incorporates the R & R's summary by reference.

### A. Facts

Banks was civilly committed to the Minnesota Sex Offender Program ("MSOP") in 1998 after being declared a "Sexually Dangerous Person" under Minnesota law.  (R & R at 3 (citing Minn. Stat. § 253B.02, subd. 18b (2012) which is now Minn. Stat. § 253D.02, subd. 16 (2013).)  Banks is currently confined at the MSOP facility located in Moose Lake, Minnesota and was confined there at all relevant times.  (Id.)  In 2009, Banks was denied release from MSOP at least in part because he refused to participate in sex-offender treatment, regularly threatened and assaulted MSOP staff, and presented a high risk of reoffending.  (Id. at 3–4 (citing Banks v. Ludeman, No. A08-2024, 2009 WL 1182314, at *1 (Minn. Ct. App. May 5, 2009).)

At the time of the R & R, Banks resided in the Omega or "Behavioral Therapy Unit ("BTU") at MSOP Moose Lake.[1]   (Id. at 4.)   The BTU houses detainees who engage in "significant and ongoing criminal, disruptive, and assaulting behavior and often exhibit continuing behavioral problems."   (Id.)   Detainees in the BTU have a more structured and limited routine than other MSOP detainees.   (Id.)   Part of this structure includes an Individual Program Plan ("IPP") used by clinicians to help "identify, define, and decrease the repetitive behaviors that affect" a detainee's ability to succeed within MSOP generally.   (Id.)

MSOP clinicians testified that Banks' IPP was implemented because he continually had difficulties complying with BTU guidelines and behavioral expectations. (Id.)   For instance, Banks refused to abide by personal hygiene and room care rules, as well as policies regarding the amount of combustible materials that may be in a detainee's room.   (Id.)   To have the IPP lifted or modified, Banks had to demonstrate compliance with BTU rules and policies.   (Id. at 4–5.)

In October 2008, Banks sued several State defendants under 42 U.S.C. § 1983 for allegedly seizing and damaging or losing his personal property.   (Id. at 5 (citing Banks v. Ludeman, No. 08-cv-5792 (MJD/JJK) (D. Minn. 2008).)   The parties settled that suit in January of 2011 whereby, in exchange for $1,400, Banks released the defendants "and the State of Minnesota, DHS, and MSOP, including their employees, officials and agents,

---

[1] As explained below, this case was stayed for several years shortly after the R & R was issued.  The Court is unaware of what, if any, developments related to the conditions of Banks' confinement have occurred since the R & R was issued.

from any claim, cause, right, or liability that [Banks] may have against them, whether known or unknown at this time," relating to that case.  (See id.)

In June of 2011, Banks commenced the present lawsuit, again asserting § 1983 claims against a variety of State of Minnesota employees involved with MSOP.  (Id.) Defendants Jesson, Benson, Barbo, Ninneman, Hebert, Lundquist, and Moser worked in supervisory capacities at MSOP (collectively, "the Supervisory Defendants") while the remaining Defendants worked directly with MSOP patients, including Banks.  (Id. at 5–6.)  Banks' claims allege that between 2008 and 2011, MSOP staff members "seized, or threatened to seize, items of [Banks'] personal property that were considered 'contraband' under MSOP regulations."  (Id. at 6.)  Some of these items were magazines, catalogs, or videos that contained images deemed to be sexually provocative while others were deemed to promote escape or illegal activities.  (Id.)  MSOP also refused to allow Banks to purchase or possess certain electronic devices (e.g., computers, videogame systems, removable electronic storage devices).  (Id.)

Most of the materials MSOP staff took or threatened to take from Banks were deemed to violate, or possibly violate, MSOP's regulations, including the Media Policy. (Id. (noting that Minn. Stat. § 246B.04 requires that the Minnesota Department of Human Services implement certain policies and procedures related to the materials MSOP detainees may possess).)  The Media Policy is intended to:

> provide a therapeutic living environment for patients in the [MSOP] that enhances their rehabilitation, to provide a safe and secure environment for all persons in MSOP facilities, and to comply with the provisions of Minnesota Statutes section 246B.04, subdivision 2, by restricting patients from possessing obscene, pornographic, or other prohibited materials in a

4

way that is consistent with the constitutional rights of civilly-committed patients.

(Id. at 7 (quoting the Media Policy[2]).)

The Media Policy divides materials into three categories: (1) "Prohibited Materials"; (2) "Counter-Therapeutic Materials"; and (3) "Permitted Materials."  (Id. at 8.)  MSOP detainees may not have Prohibited Materials, which include in relevant part: "[a]ny pictures, including pictures in reading materials, or videos showing close-up depictions of . . . human genitalia in a lewd and explicit fashion"; and "[p]ictures, videos or reading materials that . . . taken as a whole, predominantly and prominently display nudity, and have the primary purpose of sexual arousal, in a manner similar to adult oriented sexual magazines . . . ."[3]  (Aff. of Ricardo Figueroa ("Figueroa Aff.") at ¶ 5 [Doc. No. 19], Ex. D ("Media Policy") at 2 [Doc. No. 19-1].[4]

Counter-Therapeutic Materials are those which are "antithetical to the rehabilitation" of either the patient possessing them or a significant number of other patients who might experience them, but are not strictly prohibited.  (R & R at 8.)  MSOP

---

[2] The Media Policy was implemented in 2007 as the result of a settlement reached in another case challenging MSOP regulations on First Amendment grounds.  See Ivey v. Mooney, No. 05-cv-2666 (JRT/FLN), 2008 WL 4527792 (D. Minn. Sept. 30, 2008).

[3] As described later, Banks disputes exactly what materials the Media Policy prohibits.  Thus, the Court quotes directly from the Media Policy itself, instead of referring to the R & R's summary.  (See R & R at 8 (summarizing the Media Policy's definition of prohibited items).)

[4] The exhibits accompanying the Figueroa Affidavit were presented as a single attachment.  (See Doc. No. 19-1.)  The R & R cites to page numbers as they appear in each individually paginated exhibit.  (See, e.g., R & R at 7.)  For the sake of clarity and consistency, this Court does the same.

patients are discouraged from having Counter-Therapeutic Materials, but may elect to keep them, although the detainee's decision to retain such materials is noted in his/her treatment records. (Id.)  Permitted Materials are those not classified as Prohibited or Counter-Therapeutic. (Id.)

To review detainee materials, MSOP has a Media Review Team ("MRT") consisting of staff members trained to assess detainee property under the terms of the Media Policy. (Id.)  Detainee materials are scanned for content upon arrival at MSOP and detainees' possessions are subject to searches to ensure compliance. (Id. at 8–9.)  If MSOP staff discovers an item suspected of being Prohibited or Counter-Therapeutic, it is confiscated and given to the MRT for review. (Id. at 9.)  Either the MRT or the detainee may request that an MSOP senior administrator review and ultimately decide what designation a particular piece of media receives. (Id.)  If an item is deemed Prohibited, the detainee is given ten days to destroy it, send it to someone outside of MSOP, or arrange to have it retrieved by someone outside of MSOP. (Id.)  If the detainee does not dispose of the item in the manner described above, it is destroyed by MSOP staff. (Id.)

MSOP also has a Contraband Policy designed to ensure a safe, secure, and therapeutic environment by identifying, prohibiting, and responding to contraband. (Id.) That policy prohibits any item "deemed to create a risk to safety, security or therapeutic environment impacting the program or client." (Id. (quoting the Contraband Policy).) Contraband includes: (1) escape paraphernalia; (2) items that teach, describe, or contain plans for activities in violation of program rules; (3) personal computers; (4) personal

data storage devices; (5) Prohibited Materials under the Media Policy; and (6) excessive amounts of authorized items.  (Id. at 10.)

As described above, from 2008 through 2011, MSOP repeatedly confronted Banks about suspected contraband.  (Id.)  MSOP staff seized numerous items from Banks, some of which were later destroyed or sent away from MSOP while others were returned to him.  (Id.)  Banks' requests that he be allowed to possess various computers, videogame systems, and other electronic devices, were also denied.  (Id.)  Banks alleges that Defendants violated his federal constitutional rights under the First (free speech), Fourth (unreasonable search and seizure), and Fourteenth (due process) Amendments.  (Id.; Am. Compl. [Doc. No. 57].)  Banks asks for monetary damages as well as injunctive relief. (Am. Compl., Relief at 16–17.[5])

**B.  Procedural History**

Defendants moved for summary judgment on all of Banks' claims, asserting that there were no genuine issues of material fact for trial.  (Defs.' Mot. for Summ. Judg. [Doc. No. 16].)  That motion was referred to Magistrate Judge Keyes ("Judge Keyes") who issued the R & R.  (See R & R at 2–3.)  Judge Keyes prudently addressed the motion in three parts: (1) claims he recommended dismissing because there were no triable issues, (see id. at 13–33); (2) claims he recommended not be dismissed because there were triable issues, (see id. at 33–35); and (3) other claims and defenses, (see id. at 35–40).

---

[5] The Court refers to the page numbers since the Relief section does not contain paragraph designations.

## 1.  Banks' Claims that Judge Keyes Recommended Dismissing

Judge Keyes divided Banks' claims that he recommended dismissing into categories based on the type of item seized or the MSOP policy involved.  Banks' claims and Judge Keyes' recommendations are summarized below.

### a.  Claims Related to the Seizure of Media Items

The first group of claims relate to various media items (e.g., photos, books, magazines) that were seized from Banks because they: (1) contained images of nudity and exposed genitals in violation of MSOP's Media Policy, (see R & R at 12–13); (2) constituted escape or criminal activity paraphernalia under MSOP's Contraband Policy because they detailed how to obtain dual citizenship, create offshore bank accounts, and move around Minnesota, (see id. at 13–14); or (3) were stickers seized under MSOP's Property Policy because they could be used to smuggle drugs into the facility, (see id. at 14–15).  All the seized items were either destroyed or sent outside of MSOP pursuant to the procedure described above.  (See id. at 12–15.)  Banks submitted no evidence to rebut Defendants' evidence about how or why the items were seized.  (See id. at 15, 20–21.)

Judge Keyes employed the test set forth in Turner v. Safley, 482 U.S. 78 (1987) to assess whether any of these seizures violated Banks' constitutional rights.  (Id. at 15–17.)  Judge Keyes concluded Banks' First Amendment rights were not violated because: (1) MSOP's interests in detainee rehabilitation and facility security were valid and rationally connected to the Media and Contraband Policies, (see id. at 17–19); (2) Banks had alternative means of exercising his First Amendment rights by receiving items which did not violate MSOP's policies, (see id. at 19); (3) accommodating Banks' desire to have the

prohibited materials would have a substantial negative "ripple effect" on other MSOP detainees' and MSOP's efforts at rehabilitation, (see id. at 19–20); and (4) there were no "ready alternatives" to MSOP's Media and Contraband Policies that would allow Banks to possess the seized items without adversely affecting MSOP's therapeutic and security interests, (see id. at 20).

Judge Keyes similarly found that the seizure of these materials did not violate Banks' Fourth Amendment right against unreasonable seizure.  (See id. at 22.)  "No reasonable factfinder could conclude that it is 'unreasonable' to seize such sexually explicit photographs from a civilly-committed sex offender who is confined, in company with other sex offenders, in an institution that is supposed to provide rehabilitative treatment."  (Id.)

Finally, Judge Keyes assessed whether the seizure of these materials violated Banks' Fourteenth Amendment due process rights.  (See id. at 22–24.)  Judge Keyes concluded Banks' procedural due process rights were not violated because Banks did not have a protected property or liberty interest in the seized materials.  (See id.)  Judge Keyes also noted that any substantive due process claim Banks might have was subsumed by his First and Fourth Amendment claims, which failed for the previously stated reasons.  (See id. at 24.)

### b.  Claims Related to MSOP Policies

The second group of claims relate to Banks' contention that various MSOP policies violated his First, Fourth, and Fourteenth Amendment rights.  (See id. at 25–30.)  Banks alleges MSOP's prohibition on detainees owning removable electronic storage

devices (e.g., flash drives, DVDs, CDs) violates his constitutional rights.  (See id. at 25.)

Defendants respond that detainees are prohibited from possessing or using removable

electronic storage devices, but that MSOP permits detainees to transfer their electronic

information (e.g., documents, media, etc.) to an internal network that they may access on

MSOP computers.  (Id.)  Judge Keyes held that this policy did not violate Banks'

constitutional rights because the First Amendment did not include the right to store data

on removable electronic devices.  (Id. at 25–26.)  Because Banks did not allege that any

of his electronic storage devices were actually searched or seized, Judge Keyes found he

had no Fourth Amendment claim.  (Id. at 26.)  Similarly, Banks did not allege what

process he was due or denied and thus could not sustain a claim under the Fourteenth

Amendment.  (Id.)

Banks also alleges that MSOP's policies limiting detainees' access to computers,

email, and the internet violate his First and Fourteenth Amendment rights.  (See id. 26–

27.)  Defendants explain that personal computers are prohibited due to security concerns

and that detainees are not allowed to use MSOP's internal network to access email or the

internet out of concerns for the orderly and proper use of MSOP's computers and

network.  (See id. at 27.)  Judge Keyes concluded that the First Amendment did not

afford Banks a protected right to possess or use a computer, access email, or use the

internet.  (Id. at 27.)  He also found that MSOP's restrictions on Banks' computer access

did not involve any protected liberty or property interests and thus did not trigger any due

process concerns.  (Id.)

Banks similarly alleges that MSOP's refusal to allow him to purchase and possess various electronic gaming and radio devices violates his First and Fourteenth Amendment rights.  (See id. at 28.)  Defendants presented evidence that the prohibition against MSOP detainees possessing such devices was for therapeutic and security reasons.  (See id. at 28–29.)  Judge Keyes concluded Banks had no protected right to possess these devices and presented no argument about what process he was due but denied.  (Id. at 29.)

Banks alleges that MSOP's policy restricting the wall space on which detainees may hang pictures and other items violates his First and Fourteenth Amendment Rights. (See id.)  Defendants explained that this restriction was imposed to comply with the Fire Marshal's order that the amount of combustible materials in detainees' rooms be reduced.  (Id.)  Judge Keyes found that this restriction did not raise any First Amendment concerns because it was clearly content neutral, nor did it implicate the Fourteenth Amendment because Banks failed to identify any recognized liberty interest or procedural due process violation.  (Id. at 29–30.)

Finally, Banks claims that Defendant Benson enacted a policy which prohibited Banks from receiving an education.  (Id. at 30.)  Defendant Benson averred that he enacted no such policy.  (Id.)  For the same reasons Judge Keyes recommended dismissing Banks' other policy-based claims, he also recommended dismissing Banks' education claim.  (Id.)

### c. Claims Regarding the Seizure of Property that Was Subsequently Returned or Inadvertently Lost

Several of Banks' claims relate to property which was seized but ultimately returned to him after MSOP staff determined that it not was prohibited under MSOP's policies. (Id. at 30–31.) Others relate to property which was seized and inadvertently misplaced or lost by MSOP staff. (Id. at 31–32.) Judge Keyes concluded that the temporary seizure or inadvertent loss of Banks' property did not amount to constitutionally cognizable claims and thus recommended that they be dismissed. (See id. at 30–32.)

### 2.  Banks' Claims that Judge Keyes Recommended Not Dismissing

Judge Keyes recommended dismissing many, but not all of Banks' claims related to the seizure of his property. (See id. at 33.) Where Defendants failed to produce sufficient evidence for Judge Keyes to conclude as a matter of law that no constitutional violations had occurred, he recommended that Banks' claims not be dismissed at this time. (See id. at 33–34.) Judge Keyes noted that "[i]t may be that the seizure and/or destruction of these items had been entirely warranted under the Media Policy, and constitutional under Turner as well, but Defendants have not yet substantiated that proposition." (Id. at 34.)

### 3.  Defenses and Other Claims Addressed in the R & R

Defendants argue that they are entitled to qualified immunity against Banks' claims. (Id. at 35.) However, Judge Keyes concluded that the issue of qualified immunity was moot as to the claims he recommended dismissing and that Defendants failed to provide sufficient evidence to decide whether they were entitled to qualified immunity as a matter of law on Banks' remaining claims. (See id. at 35–36.)

Judge Keyes also noted that Banks sued Defendants in their individual and official capacities seeking monetary and injunctive relief. (Id. at 36.)  The Eleventh Amendment immunizes state officials acting in their official capacity from liability for damages under § 1983. (Id.)  However, the Eleventh Amendment does not bar claims for equitable relief against state officials in their official capacity, nor does it bar claims for monetary damages against state employees in their individual capacities. (Id.)  Thus, Judge Keyes recommended dismissing Banks' claims to the extent they sought monetary damages for actions taken in Defendants' official capacities. (Id.)

Judge Keyes next looked at Banks' claims against the Supervisory Defendants. (See id. at 36–37.)  Banks contends that the Supervisory Defendants directed or ordered their subordinates to engage in the allegedly unconstitutional conduct that serves as the basis for his other claims. (See id. at 37.)  The Supervisory Defendants submitted evidence, unrefuted by Banks, that they never directed their subordinates to perform any of the acts giving rise to Banks' claims, nor were they personally involved in any of those acts. (See id. at 36–37.)  Thus, Judge Keyes recommended Banks' claims against the Supervisory Defendants be dismissed. (Id. at 37.)

Judge Keyes then addressed Banks' First Amendment retaliation claims. (See id. at 37–39.)  Banks alleges that Defendants Collins and Jensen seized some of his property and threatened to file disciplinary reports against him to discourage him from exercising his constitutional rights (i.e., pursuing this lawsuit). (See id. at 38–39.)  Judge Keyes found that Banks' retaliation claims failed as a matter of law because the property at issue was either properly seized pursuant to MSOP's policies, or subsequently returned to

13

Banks.  (Id.)  Furthermore, Judge Keyes noted that there was no evidence that these seizures were motivated by Banks exercising his First Amendment rights, as required to sustain a retaliation claim.  (Id.)

Finally, Judge Keyes addressed Defendants' res judicata defense.  (See id. at 39–40.)  Defendants argue that some of Banks' claims are barred by res judicata because they are encompassed by the 2011 settlement agreement that resolved Banks' earlier lawsuit. (Id.)  Banks contends that his current claims are not covered by that agreement and if they are, he was tricked into signing an agreement that was broader than was represented to him.  (Id. at 40.)  Judge Keyes held that disputed issues of material fact prevented res judicata from applying as a matter of law.  (Id.)

### 4.  Banks' Objections

Banks makes several objections to portions of the R & R.  (See Pl.'s Obj.)  First, he argues that Defendants' seizure of some of his media items was improper according to MSOP's own Media Policy since those items did not qualify as Prohibited Materials. (See id. at 1-2.)  Second, Banks contends that Defendants' seizure of his property discussing dual citizenship and offshore banking as well as his stickers was improper because those materials were actually allowed under the Contraband Policy.  (See id. at 2–3.)  Third, Banks claims that MSOP's policies prohibiting detainees from possessing certain types of personal computers and accessing email and the internet are unconstitutional because they are more restrictive than the limits placed on inmates confined in Minnesota prisons and also fail the Turner test.  (See id. at 3–4.)  Fourth, Banks argues that Defendant Benson's refusal to advance his treatment

designation/classification effectively prevents him from receiving an education.[6]  (See id. at 5.)

Defendants oppose Banks' objections and generally argue that the R & R's recommendations were correct.  (See DHS Defendants' Resp. to Pl.'s Obj. ("Defs.' Resp.") [Doc. No. 78].)  They also request that the Court issue a new scheduling order to permit the parties to conduct discovery and file dispositive motions on Banks' remaining claims.[7]  (Id. at 2, n.2.)

## II.    DISCUSSION

### A. Standard of Review

*Pro se* complaints are liberally construed.  See Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004).  However, even under this liberal standard, a *pro se* complaint must

---

[6] Banks also objects to the R & R's conclusions regarding the Eleventh Amendment and qualified immunity.  (See Pl.'s Obj. at 5.)  Banks notes that he sued Defendants in their individual and official capacities, "which opens them up to monetary damages and they are not entitled to qualified immunity."  (Id.)  Banks misreads the R & R.  First, the R & R plainly recommended *not* finding qualified immunity as a matter of law at this time on Banks' surviving claims.  (See R & R at 35–36.)  The Court agrees with this conclusion. Second, the R & R recognized that the Eleventh Amendment did *not* bar Banks' surviving § 1983 claims seeking equitable (i.e., injunctive) relief against Defendants in their official capacities, or monetary damages against Defendants in their individual capacities.  (See R & R at 36.)  However, Judge Keyes is correct that the Eleventh Amendment immunizes state officials, like Defendants, acting in their official capacities from monetary damages.  See Reynolds v. Dormire, 636 F.3d 976, 981 (8th Cir. 2011) (state prison official could be sued in his official capacity for equitable relief, but not monetary damages).

[7] Shortly after Banks filed his objections, but before Defendants filed their response or this Court ruled on the objections, the case was stayed for nearly four years.  (See Order dated May 9, 2016 [Doc. No. 77].)  The previous scheduling order in this case and the deadlines it set for discovery and motion practice are thus moot.  (See Sch. Order [Doc. No. 63].)  Magistrate Judge Mayeron will issue a new scheduling order for discovery and motion practice on Banks' remaining claims.

contain specific facts in support of the claims it advances.  See Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985).  Courts do not "assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint." Stone, 364 F.3d at 915.  On summary judgment, the Court views the facts in the light most favorable to the nonmoving party, but that party "may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial." Mann v. Yarnell, 497 F.3d 822, 825 (8th Cir. 2007).

The Court must conduct a *de novo* review of any portion of a magistrate judge's report and recommendation to which specific objections are made.  28 U.S.C. § 636(b)(1); Fed. R . Civ. P. 72(b); D. Minn. L.R. 72.2(b).

### B.  The Seizure of Certain Items Pursuant to the Media Policy

Banks objects that Defendants' seizure of his media items was unconstitutional because those items were not in fact Prohibited Materials under MSOP's Media Policy. (See Pl.'s Obj. at 1–2.)  Banks understands the Media Policy to prohibit items containing "**close-up depictions of human genitalia in a lewd and explicit fashion and taken as a whole, predominantly** and **prominently display nudity, <u>and</u> have the primary purpose of sexual arousal, in a manner similar to adult oriented sexual magazines** . . . ." (Id. at 1 (all emphasis original).)  Banks claims that many of the media items taken from him do not fit this definition and thus Defendants had no right to seize them.  (See id. at 1–2.)

Defendants contend that the seizure of these items was constitutional and done in accordance with MSOP's Media Policy.  (See Defs.' Resp. at 4–6.)  They note that

Banks' understanding of what materials are prohibited under the Media Policy treats two separate categories of prohibited materials as one.   (See id. at 4–5.)   Regardless, Defendants argue that the bases for the Media Policy, to promote MSOP's therapeutic and security interests, make the seizures constitutional under the Turner test.  (Id. at 5–6.)

In Turner, the Supreme Court set forth four factors to consider when assessing restrictions placed on prisoners' constitutional rights.  See 482 U.S. at 89–90.  Those factors are:

> (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; (4) and whether there exist alternatives to accommodate the prisoner with a de minimis cost.

Murchison v. Rogers, 779 F.3d 882, 887 (8th Cir. 2015).  Civilly committed persons in MSOP, like Banks, have liberty interests that are "considerably less than those held by members of free society" but are "entitled to more considerate treatment and conditions of confinement" than prisoners.  Senty-Haugen v. Goodno, 462 F.3d 876, 886 (8th Cir. 2006) (quotations omitted); see also Revels v. Vincenz, 382 F.3d 870, 874 (8th Cir. 2004) ("Although an involuntarily committed patient of a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner.").  Most courts use the Turner factors to assess whether MSOP's policies and regulations are reasonably related to a legitimate therapeutic or institutional interest.  See Karsjens v. Jesson, 6 F. Supp. 3d 916, 937 (D. Minn. 2014) (collecting cases using this "modified" Turner approach when addressing MSOP detainees' § 1983 claims).

17

Based on Defendants' unrebutted evidence, Judge Keyes concluded that MSOP's Media Policy prohibiting possession of items depicting nudity and visible genitals was reasonably related to legitimate therapeutic and security interests.  (See R & R at 17–18 (collecting cases).)  He also found that the other Turner factors weighed in favor of the Media Policy.  (See R & R at 19–20.)  This Court agrees with Judge Keyes.  Notably, Banks does not object to these conclusions.  Instead, he argues that the items which were seized from him did not constitute Prohibited Materials under the Media Policy.  Even if Banks were correct—which he is not, as discussed below—this does not change the fact that MSOP is constitutionally allowed to implement and enforce a policy which prohibits detainees from possessing items depicting nudity and visible genitals.

Banks misreads what the Media Policy classifies as Prohibited Material.  The Media Policy defines one category of Prohibited Materials as "[a]ny pictures, including pictures in reading materials, or videos showing close-up depictions of . . . human genitalia in a lewd and explicit fashion[.]"  (Media Policy at 2.)  Another category of Prohibited Materials are "[p]ictures, videos or reading materials that . . . taken as a whole, predominantly and prominently display nudity, and have the primary purpose of sexual arousal, in a manner similar to adult oriented sexual magazines . . . ."  (Id.)  These are two distinct categories of Prohibited Materials, not one combined category as Banks understands it.  (See Pl.'s Obj. at 1–2.)  Defendants' unrefuted evidence shows that the items seized from Banks fell into one, or both, of these prohibited categories.  (See R & R at 12–13 (detailing Defendants' evidence).)

**C.  The Seizure of Certain Items Pursuant to the Contraband Policy**

Banks objects that the seizure of his property dealing with obtaining dual citizenship, living outside the United States, and offshore banking was unconstitutional. (See Pl.'s Obj. at 2–3.)   Specifically, he contends that these materials cannot be considered contraband because MSOP allows detainees to possess other "accounts (checking, credit/debit cards) and identity documents."   (See id. at 2.)  Banks similarly challenges Defendants' basis for seizing his stickers—concern about detainees using stickers to smuggle drugs into the facility—because detainees are allowed to possess things like mailing labels.  (See id. at 3.)  In support, Banks submits several exhibits consisting of a receipt for "secured items" related to a checking account Banks was allegedly permitted to open and "examples" of stickers Banks was allowed to have or that he somehow obtained.  (See Doc. Nos. 67, 67-1, 67-2, and 67-3.)  Judge Keyes did not consider these exhibits as part of the R & R because Banks did not submit them until he filed his objections.  Defendants object to Banks' previously undisclosed exhibits, but argue that even if the Court considers them, they at most show MSOP's contraband policies were inconsistently applied, a fact which has no bearing on the constitutionality of the seizures or the policies themselves.  (See Defs.' Resp. at 6–7.)

Judge Keyes concluded that seizures pursuant to MSOP's Contraband Policy were constitutional under Turner because they related to MSOP's legitimate security interests. (R & R at 18–19.)  Again, this Court agrees.  As Judge Keyes accurately stated, Banks "is not prohibited from access to all materials relating to 'wealth management,' travel, and the like, but only to those items that can be used for purposes of escape or other illegal activity."  (R & R at 19.)  Defendants presented unrebutted evidence that the items seized

from Banks constituted escape paraphernalia, or could be used to further other illegal activity (e.g., drug smuggling), and thus were impermissible.  (R & R at 13–14 (summarizing Defendants' evidence).)

Even if the Court considered Banks' untimely exhibits, they would not change the result.  See United States v. Jaunich, No. 13-cr-183 (JRT/LIB), 2014 WL 1026331, at *12 (D. Minn. Mar. 14, 2014) ("Although the Court has discretion to consider evidence presented for the first time in a party's objection to the magistrate judge's recommendation it is under no obligation to accept new evidence." (quotations omitted)).  Those exhibits show that—in accordance with MSOP's policies—Banks is allowed to have certain materials related to wealth management and banking that are not escape paraphernalia and that he is capable of obtaining certain types of stickers.  At most they show that MSOP's policies related to stickers are inconsistently enforced.  These "facts" have no bearing on the legal sufficiency of Banks' claims or the constitutionality of MSOP's Contraband Policy and its enforcement.

### D.  MSOP's Policies

Banks objects that MSOP's policies preventing him from possessing the personal computer of his choice or videogame systems and limiting his access to the internet and email are unconstitutional.  (See Pl.'s Obj. at 3–4.)  Banks advances two arguments. First, he claims that as a civilly committed individual he is entitled to more unrestrained conditions of confinement than prisoners.  (See id. at 3.)  According to Banks, prisoners in Minnesota have access to email and the internet and thus he is entitled to the same. (See id.)  Second, Banks argues that MSOP's email/internet policy fails the Turner test.

(See id. at 4.)  He claims that allowing detainees greater access to computers, email, and the internet would increase institutional security by reducing "old-fashioned paper mail" which may contain contraband and allow for "positive socialization" by increasing detainees' "controlled access to the public."  (Id.)  Banks alleges that MSOP already has a policy in place for its staff to securely use the internet and that this policy could simply be expanded to detainees.[8]  (Id.)  Finally, Banks contends that MSOP's current policies leave him no alternative way to exercise his First Amendment rights because "E-mail/internet has is [sic] the world[']s primary means of communication and press."  (Id.)

Defendants respond by arguing that there is no constitutional right to use a computer, email, or the internet and thus the Turner test is not implicated.  (Defs.' Resp. at 10.)  They cite numerous cases holding that MSOP's limitations on detainees' use of computer, email, and the internet do not offend the Constitution.  (Id. at 8–9.)

Judge Keyes noted that:

The problem with [Banks'] claim that he was unconstitutionally denied computer privileges—both the privilege to possess a personal computer of his choice and to access the internet and e-mail—is that [Banks] has no identifiable constitutional right to possess or use a computer or have an email account or internet access.  Although it would likely be more convenient for [Banks] to communicate with others through electronic rather than conventional mail, there is nothing to indicate that the content of his speech was in any way limited by these computer policies, so First

_____

[8] Banks repeatedly refers to "MSOP Policy 105.205 Internet Access (Plaintiff Exhibit 234)" in support of his argument that there is an alternative policy available that, if extended to detainees, would allow them to securely use the internet and email.  (See Pl.'s Obj. at 3–4.)  Banks produced a copy of this policy as an exhibit accompanying his objections, not as part of his response to Defendants' Motion for Summary Judgment.  (See Exhibit 234 ("MSOP Staff Internet Policy") [Doc. No. 68-7].)  The policy governs how MSOP *employees* use the internet while at an MSOP facility.  (See id.)

> Amendment speech concerns are not triggered.   The same is true with respect to internet access.

(R & R at 27.)   Judge Keyes is again correct; MSOP's limitations on detainees' use of computers, email, and the internet do not raise constitutional concerns.   See Senty-Haugen, 462 F.3d at 886, n.7 (finding that limitations on computer privileges were "*de minimis* restrictions with which the Constitution is not concerned" (quotations omitted)); Pyron v. Ludeman, No. 10-cv-3759 (PJS/JJG), 2011 WL 3293523, at *5 (D. Minn. June 6, 2011), report and recommendation adopted, No. 10-cv-3759 PJS/JJG, 2011 WL 3290365 (D. Minn. July 29, 2011), aff'd sub nom. Hollie v. Ludeman, 450 F. App'x 555 (8th Cir. 2012) ("If detainees have no constitutional right to computers or to computer privileges, then they have no constitutional right to a certain type or amount of computer storage or to a computer printer."); Semler v. Ludeman, No. 09-cv-0732 (ADM/SRN), 2010 WL 145275, at *24 (D. Minn. Jan. 8, 2010) ("No federal, state or local statute creates a property right for Plaintiffs to possess computers and electronics . . . ."); Aune v. Ludeman, No. 09-cv-0015 (JNE/SRN), 2010 WL 145276, at *7 (D. Minn. Jan. 8, 2010) (same); Ivey v. Ludeman, No. 05-cv-2666 (JRT/FLN), 2006 WL 2786961, at *14 (D. Minn. Sept. 26, 2006) (no constitutionally protected interest in possessing a computer).

Even if the Court were to consider the Turner factors, they weigh heavily in favor of MSOP's restrictions on computer and internet use.   As previously described, MSOP's policies are reasonably related to its legitimate therapeutic and security interests.   Banks' argument that MSOP could simply extend its *employee* internet usage policy to detainees

misses the point.  MSOP's interests in controlling employee internet usage are markedly different than its interests in controlling the same for detainees who are deemed dangerous sex offenders and are confined for therapeutic purposes.  Extending an employee internet usage policy to detainees would hamper MSOP's therapeutic and security interests and thus is not a viable alternative.  Moreover, despite MSOP's restrictions on his computer and internet use, Banks is able to exercise his First Amendment rights through other mediums (e.g., letters, phone calls, etc.).

Banks' status as a civilly committed person does not enhance the viability of his claims.  As explained above, so long as a limitation or restriction on a civilly committed person complies with the "modified" Turner analysis, it passes constitutional muster.  See Senty-Haugen, 462 F.3d at 886, n.7 (despite finding that civilly committed detainees at MSOP are "entitled to more considerate treatment and conditions of confinement" than prisoners, ultimately holding that MSOP's limitations on computer use are "*de minimis* restrictions with which the Constitution is not concerned").  MSOP's limitations on detainees' use of computers, email, and internet, to the extent they implicate constitutional concerns at all, pass this test.

### E. Defendant Benson's "Policy" Prohibiting Banks From Receiving An Education

Banks objects that Defendant Benson has effectively denied him an education by implementing "education policy 204.040."[9]  (See Pl.'s Obj. at 5.)  Banks contends this

---

[9] Banks has not produced any exhibit containing "education policy 204.040."  Although Banks cites to "Plaintiff Exhibit 235," he has not produced that document.  (See Pl.'s Obj. at 5.)  The Court can find no evidence of "education policy 204.040" in the record.

policy requires that he be in "Phase II" before he can "receive an education," but that to be in "Phase II" he must participate in "experimental treatment." (See id.) Defendants respond by noting that Banks failed to produce any evidence of a policy prohibiting him from receiving an education, whereas Defendant Benson produced evidence no such policy exists. (See Defs.' Resp. at 11.)

Banks' objection and his related claim suffer from multiple deficiencies. First, Banks failed to produce any evidence, other than his own self-serving allegations, in support of his claim that Defendant Benson prevented him from receiving an education. Banks did not even produce the allegedly offending policy. Banks cannot sustain his claim based on his self-serving allegations alone. See Denn v. CSL Plasma, Inc., 816 F.3d 1027, 1032 (8th Cir. 2016) ("A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial."). Second, even supposing there was a policy preventing Banks from receiving an education, he has no constitutionally recognized right to an education, especially as a civilly committed detainee. See Wishon v. Gammon, 978 F.2d 446, 450 (8th Cir. 1992) ("Prisoners have no constitutional right to educational or vocational opportunities during incarceration . . . ."); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 35 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected.").

### III.   ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1. Plaintiff's Appeal of the Report and Recommendation [Doc. No. 64] is **OVERRULED**.

2. The Report and Recommendation [Doc. No. 62] is **ADOPTED IN ITS ENTIRETY**.

3. Defendants' Motion for Summary Judgment [Doc. No. 16] is **GRANTED IN PART AND DENIED IN PART** as follows:

    a. Paragraphs 1–3, 7, 14, 15, 18–24, 26, 28, 30–34, and 39–41 of the Amended Complaint [Doc. No. 57] are **DISMISSED WITH PREJUDICE**;

    b. Defendants Jesson, Benson, Moser, Lundquist, Herbert, Barbo, Ninneman, Furey, Ranem, Kosloski, Sater, Joseph, Thao, Goodwin, Haller, and Ligget are **DISMISSED** from this action;

    c. To the extent Plaintiff's claims for damages are asserted against Defendants for acts done in their official capacities, those claims are **DISMISSED;** and

    d. The remaining Defendants' motion for summary judgment to dismiss Paragraphs 4–6, 8–13, 17, 25, 27, 29, and 35–38 of the Amended Complaint is **DENIED**.

4. Magistrate Judge Mayeron will issue a new scheduling order addressing discovery and motion practice for Plaintiff's remaining claims.


Dated:  June 27, 2016                           s/ Susan Richard Nelson
                                                SUSAN RICHARD NELSON
                                                United States District Judge