# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Eugene Christopher Banks,<br><br>        Plaintiff,<br>v.<br><br>Lucinda Jesson[1], et. al,<br>in their Official and Individual<br>Capacities;<br><br>        Defendants, | Case No. 11-cv-1706 (SRN/LIB)<br><br><br><br>**ORDER** |

Eugene Christopher Banks, *pro se*, MSOP-Moose Lake, 1111 Hwy 73, Moose Lake, MN 55767.

Aaron Winter and Max H. Kieley, Minnesota Attorney General's Office, 445 Minnesota St., Ste. 1100, St. Paul, MN 55101 for Defendants.

SUSAN RICHARD NELSON, United States District Judge

      This matter is before the Court on Defendants' Motion for Summary Judgment ("Defs.' Summ. J. Mot.") [Doc. No. 106] and Plaintiff's Motion to Amend the Complaint ("Mot. to Am.") [Doc. No. 117]. For the reasons set forth below, Plaintiff's Motion to Amend is denied, Defendants' Summary Judgment Motion is granted, and Plaintiff's remaining claims are dismissed.

---

[1] Previously, this Court dismissed Defendants Jesson, Benson, Moser, Lundquist, Herbert, Barbo, Ninneman, Furey, Ranem, Kosloski, Sater, Joseph, Thao, Goodwin, Haller, and Ligget from the case. (*See* Order dated 6/27/2016 [Doc. No. 81].) Only Defendants Rose, Hammond, Hines, Leritz, Collins, Bergman, Jensen, Lundgren, Scanlon, Dahl, and Bonrud remain. However, for the sake of consistency when citing this case, the Court continues to employ the original case caption.

# I.    BACKGROUND[2]

## A. Facts

### 1.  The Minnesota Sex Offender Program and Its Media Policy

The Minnesota Sex Offender Program ("MSOP" or the "Program") was created by the State of Minnesota to securely house and treat sex offenders who are civilly committed because they are determined to be "sexually dangerous persons." *See* Minn. Stat. § 246B.02.[3]  A "sexually dangerous person" is one who "(1) has engaged in a course of harmful sexual conduct as defined in subdivision 8; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 8."  Minn. Stat. § 253D.02, subd. 16(a).

MSOP is statutorily mandated to enact policies that prohibit persons within the Program (often referred to as "clients" or "patients") from obtaining obscene or pornographic materials.  *See* Minn. Stat. § 246B.04, subd. 2.  To fulfill this mandate, and in response to litigation on the First Amendment rights it implicates, MSOP implemented a media policy in 2007 (the "Media Policy").  *See Ivey v. Mooney*, No. 05-cv-2666

---

[2] Many of the relevant facts and the procedural history of this case were previously discussed in the Report and Recommendation ("R&R") of Magistrate Judge Keyes and the order of this Court adopting the R&R.  (*See* Doc. Nos. 62 and 81.)  No party has contested the accuracy of those recitations.  Thus, for the sake of brevity, the Court recounts facts and procedural history without employing pin cites to its previous orders.  Where new facts are provided, the Court duly cites to the record.

[3] Since this case was first filed, some of the relevant Minnesota statutes have been renumbered, but they remain substantively identical to those in effect at the time the suit was initiated.  The Court cites to the statutes' present-day numbering.

(JRT/FLN), 2008 WL 4527792, at *1–2 (D. Minn. Sept. 30, 2008). The Media Policy

expressly recognizes clients' First Amendment rights, but also states that "some sexually

explicit materials, which are otherwise legal, can increase the likelihood of assaultive or

harassing behavior among committed patients. These materials may also hinder a

patient's rehabilitation." (Aff. of Ricardo Figueroa ("Figueroa Aff.") at ¶ 5 [Doc. No.

19], Ex. D ("Media Policy") at 2 [Doc. No. 19-1].[4]) Jannine Hébert—the Executive

Clinical Director for MSOP—offered the following explanation as to why sexual

materials need to be tightly controlled in the MSOP setting:

> It is common practice to limit client exposure to sexually explicit material,
> including material that contains nudity, in the treatment of sex offenders,
> particularly for those who are early in treatment. It is perhaps even more
> relevant to do so with clients who are deemed high risk by the courts or
> being treated in a residential setting. This is done for the individual
> treatment of clients as well as for the health of the therapeutic community
> as a whole. Sexually explicit material can become a "commodity" in a
> residential program. When it is in the therapeutic community it is
> frequently purchased and exchanged between clients to promote deviancy
> and encourage clients to remain in the assault cycles or fantasy worlds
> thereby impeding the treatment process. For some individual clients it
> allows them to relive their damaging offending and keep their victims
> "alive" in their thoughts and fantasies and actions. Sexual compulsivity
> and hypersexuality is common in high risk sex offenders and it is part of
> treatment to control the environment that "triggers" their deviancy.
>
> All civil commitment programs for sex offenders restrict pornography,
> including material that contains nudity. Some programs allow sexually
> explicit material only in the course of treatment interventions. MSOP has a
> very controlled use of sexually explicit material as part of the arousal
> management component of treatment. The use of this material is closely

---

[4] The exhibits accompanying the Figueroa Affidavit were presented as a single
attachment. (*See* Doc. No. 19-1.) The R&R cites to page numbers as they appear in each
individually paginated exhibit. (*See, e.g.*, R&R at 7.) For the sake of clarity and
consistency, this Court does the same.

monitored and is only provided if clinically indicated with highly motivated clients in the later part of the program.

(Aff. of Jannine Hébert ("Hébert Aff.") at ¶¶ 5–6 [Doc. No. 110].)

The Media Policy divides materials into three categories: (1) "Prohibited Materials"; (2) "Counter-Therapeutic Materials"; and (3) "Permitted Materials." MSOP detainees may not have Prohibited Materials, which include in relevant part:

…

3.  Any pictures, including pictures in reading materials, or videos of full or partially nude minor children with visible genitals.

4.  Any pictures, including pictures in reading materials, or videos of the unclothed or clothed figure of a minor child posing in a sexually suggestive posture or sexual manner.

…

7.  Any pictures, including pictures in reading materials, or videos showing close-up depictions of

    a.  human genitalia in a lewd and explicit fashion; [or]
    …
    f.  sadomasochistic abuse.[5]

8.  Pictures, videos or reading materials that, . . . taken as a whole, predominantly and prominently display nudity, and have the primary purpose of sexual arousal, in a manner similar to adult oriented sexual magazines . . . .

    …

10. Otherwise permitted materials of the type that the patient has misused in the past, providing that the restriction is proportionate to the misuse.

---

[5] "Sadomasochistic abuse" is defined in relevant part as "the condition of being fettered, bound, or otherwise physically restricted on the part of one so clothed or who is nude." Minn. Stat. § 617.241(b)(2).

Counter-Therapeutic Materials are those which are "antithetical to the rehabilitation" of either the patient possessing them or a significant number of other patients who might experience them, but are not strictly prohibited. MSOP patients are discouraged from having Counter-Therapeutic Materials, but may elect to keep them, although the detainee's decision to retain such materials is noted in his/her treatment records. Permitted Materials are those not classified as Prohibited or Counter-Therapeutic.

To review detainee materials, MSOP has a Media Review Team ("MRT") consisting of staff members trained to assess detainee property under the terms of the Media Policy. Detainee materials are scanned for content upon arrival at MSOP and detainees' possessions are subject to searches to ensure compliance. If MSOP staff discovers an item suspected of being Prohibited or Counter-Therapeutic, it is confiscated and given to the MRT for review. Either the MRT or the detainee may request that an MSOP senior administrator review and ultimately decide what designation a particular piece of media receives. If an item is deemed Prohibited, the detainee is given ten days to destroy it, send it to someone outside of MSOP, or arrange to have it retrieved by someone outside of MSOP. If the detainee does not dispose of the item in the manner described above, it is destroyed by MSOP staff.

### 2. Plaintiff Eugene Banks

Plaintiff Eugene Banks ("Banks") was civilly committed to MSOP in 1998 after being declared a sexually dangerous person. Banks is currently confined at the MSOP facility located in Moose Lake, Minnesota and was housed there at all relevant times. In

2009, Banks was denied release from MSOP. *Banks v. Ludeman*, No. A08-2024, 2009

WL 1182314 (Minn. Ct. App. May 5, 2009). As the appellate court explained:

> MSOP has diagnosed appellant with pedophilia, paraphilia, drug and
> alcohol abuse in a controlled environment, anti-social personality disorder,
> and narcissistic personality disorder. Since being committed, [Banks] has
> refused to participate in sex-offender treatment. [Banks] has continued to
> engage in behavior indicating an interest in children, including possession
> of a picture of a naked child, possession of letters exploiting sexual
> violence and physical and sexual abuse of children, and communications
> with two different 15-year-old boys. During virtually the entire time of his
> commitment, [Banks] has threatened and assaulted MSOP staff. In a report
> dated August 7, 2007, [Banks'] treatment team at MSOP concluded that he
> is at high risk for reoffending because of his current level of psychopathy,
> continued sexual deviancy and rule violations in an institutional treatment
> setting, failure to participate in treatment, inability to identify his sex-
> offending risk factors, and the presence of a large number of static risk
> factors.

*Id.* at *1. To this day, Banks refuses to participate in treatment at MSOP. (Aff. of Aaron

Winters ("Winters Aff.") [Doc. No. 109], Ex. 1 ("Banks Dep.") at 10 [Doc. No. 109-1].)

At all relevant times, and to this day, Banks resided in the Omega or "Behavioral

Therapy Unit ("BTU") at MSOP Moose Lake. (Aff. of Brian Ninneman ("Ninneman

Aff.") at ¶ 4 [Doc. No. 22]; Banks Dep. at 10–11.) The BTU houses detainees who

engage in significant and ongoing criminal, disruptive, and assaulting behavior and often

exhibit continuing behavioral problems. (Ninneman Aff. at ¶ 4.) Detainees in the BTU

have a more structured and limited routine than other MSOP detainees. (*Id.*) Part of this

structure includes an Individual Program Plan ("IPP") used by clinicians to help

"identify, define, and decrease the repetitive behaviors that affect" a detainee's ability to

succeed within MSOP generally. (Aff. of Debbie Thao ("Thao Aff.") at ¶ 5 [Doc. No.

27].)

MSOP clinicians testified that Banks' IPP was implemented because he continually had difficulties complying with BTU guidelines and behavioral expectations. (*Id.* at ¶ 6.) For instance, Banks refused to abide by personal hygiene and room care rules, as well as policies regarding the amount of combustible materials that may be in a detainee's room. (*Id.*) To have the IPP lifted or modified, Banks had to demonstrate compliance with BTU rules and policies. (*Id.* at ¶ 9.)

### 3. The Seized Media Items

This suit stems, in relevant part, from Defendants' seizure of various media items from Banks between 2008 and 2011 (collectively, the "seized Items"). As described below, nearly all of the items were seized because they were deemed to be Prohibited under the Media Policy. In general, these Items were classified as Prohibited because they contained nudity.

The Court briefly describes the seized Items below. For the sake of simplicity, the Court numbers the seized Items corresponding to the paragraph in the Amended Complaint that addresses each Item (e.g., the seized Item addressed in paragraph four of the Amended Complaint is referred to as Item 4). The Court also notes where Defendants produced the offending images contained within some seized Items. (*See* Winters Aff., Exs. 2–10 (containing the offending images from some of the seized Items).) Defendants have not produced any of the seized Items in their entirety, and for some seized Items, they have not produced even the offending images. However, for most of the seized Items, Defendants produced MSOP documentation detailing the reason for the seizure. (*See* Aff. of Amanda Torgerson ("Torgerson Aff.") [Doc. No. 111], Exs. 1–15.)

### a. Item 4

Banks alleges that in 2011, Defendants Jensen, Hines, and Hammond confiscated volume XXXI, issue 2, of a magazine entitled "Photo District News." (Am. Compl. at ¶ 4 [Doc. No. 57].) Banks provides some evidence that this is a publication for photographers and he believes this issue was 124 pages long. (Pl.'s Mem. in Opp. at 25–26 [Doc. No. 116].) MSOP records indicate that Item 4 was deemed to be Prohibited because it contained nudity in the form of "clearly visible [male and female] genitals." (Torgerson Aff., Ex. 1.)

### b. Item 5

Banks alleges that in 2011, Defendants Hammond and Jensen confiscated a magazine entitled "Interview," dated December/January 2011. (Am. Compl. at ¶ 5.) Banks provides some evidence that this is a publication containing interviews with—and photographs of—various celebrities and he believes this issue was 133 pages long. (Pl.'s Mem. in Opp. at 22–23.) MSOP records indicate that Item 5 was deemed to be Prohibited because it contained images of "exposed female nipple[s] and breast[s]." (Torgerson Aff., Ex. 2.)

### c. Item 6

Banks alleges that in 2011, Defendant Bergman confiscated the December 2010 issue of "W" magazine, entitled "baby love." (Am. Compl. at ¶ 6.) Banks provides some evidence that this is a fashion, art, and culture magazine and he believes this issue was at least 120 pages long. (Pl.'s Mem. in Opp. at 13–15.) MSOP records indicate that Item 6 was deemed to be Prohibited because it contained "female nudity." (Torgerson Aff., Ex.

3.)  Defendants produced several pages from the magazine, two of which contain images of exposed female breasts with visible nipples.  (Winters Aff., Ex. 2.)

### d.  Item 8

Banks alleges that in 2011, Defendants Jensen and Hammond confiscated the May 2011 special issue 13 of "Color" magazine.  (Am. Compl. at ¶ 8.)  Banks provides some evidence that this is a photography magazine featuring works by the winners of various contests.  (Pl.'s Mem. in Opp. at 31.)  Defendants produced several pages from the magazine.  (Winters Aff., Ex. 3.)  Some contain altered photos of nude women where their breasts and pubic regions are exposed, but not clearly visible.  (*Id.* at 51, 63–65.[6])  Others contain photos of nude women with their breasts or genitals fully exposed and visible.  (*Id.* at 66–68, 70.)

### e.  Item 9

Banks alleges that in 2010, Defendants Jensen, Hines, and Hammond confiscated issue 79 of a magazine entitled "Black and White."  (Am. Compl. at ¶ 9.)  Banks provides some evidence that this is a photography magazine featuring photos by various photographers.  (Pl.'s Mem. in Opp. at 28–29.)  MSOP records indicate that Item 9 was deemed to be Prohibited because it contained "pictures of exposed female nipples and breasts."  (Torgerson Aff., Ex. 4.)  Defendants produced several pages from the magazine, three of which contain images of exposed female breasts.  (Winters Aff., Ex. 4.)

---

[6] Unless otherwise indicated, when citing to a specific exhibit attached to the Winters Affidavit, the Court cites the page numbers as they appear within the exhibit itself.

#### f.  Item 10

Banks alleges that in 2010, Defendant Jensen confiscated volume XXX, issue 10, of "Photo District News." (Am. Compl. at ¶ 10.) As previously described, this is a publication for photographers and Banks believes this issue was 124 pages long. (Pl.'s Mem. in Opp. at 25–28.) MSOP records indicate that Item 10 was deemed to be Prohibited because it contained "nudity." (Torgerson Aff., Ex. 5.)

#### g.  Item 11

Banks alleges that in 2010, Defendants Jensen, Hines, Leritz, and Hammond confiscated issue 201, Winter 2010, of a magazine entitled "Aperture." (Am. Compl. at ¶ 11.) Banks provides some evidence that this is a photography magazine featuring photos by various photographers. (Pl.'s Mem. in Opp. at 28–29.) MSOP records indicate that Item 11 was initially seized because it contained "nudity." (Torgerson Aff., Ex. 6.) However, upon further review, Item 11 was determined to be merely Counter-Therapeutic, because it contained "nudity with no significant exposure of a nipple." (*Id.*) MSOP records indicate that Item 11 was returned to Banks, (*id.*), but Banks claims he never received the magazine. (Aff. of Eugene Banks ("Banks Aff.") at ¶ 30 [Doc. No. 118].)

#### h.  Item 12

Banks alleges that in 2010, Defendants Jensen and Hammond confiscated the January 2011 issue of "W" magazine entitled "Who's Hot." (Am. Compl. at ¶ 12.) As previously described, "W" is a fashion, art, and culture magazine and Banks believes this issue was at least 120 pages long. (Pl.'s Mem. in Opp. at 13, 16–17.) MSOP records

indicate that Item 12 was deemed to be Prohibited because it contained "exposed female breast[s] and nipple[s]." (Torgerson Aff., Ex. 7.) Defendants produced several pages from the magazine, one of which is a photo of a woman wearing a see-through top such that her breasts and nipples are visible and another in which a female breast is fully exposed with the nipple visible. (Winters Aff., Ex. 5.)

### i.  Item 13

Banks alleges that in 2011, Defendants Jensen and Hammond confiscated the October 2010 issue of "W" magazine. (Am. Compl. at ¶ 13.) As previously described, "W" is a fashion, art, and culture magazine and Banks believes this issue was at least 120 pages long. (Pl.'s Mem. in Opp. at 13, 18–19.) MSOP records indicate that Item 13 was deemed to be Prohibited because it contained a picture of a nude woman. (Torgerson Aff., Ex. 8.) Defendants produced several pages from the magazine, one which is a photo of a woman whose breast and nipple are exposed. (Winters Aff., Ex. 6.)

### j.  Item 17

Banks alleges that in 2011, Defendant Bonrud confiscated a catalog entitled "Movies Unlimited." (Am. Compl. at ¶ 17; Banks Dep. at 22–23.) MSOP records indicate that Item 17 was deemed to be Prohibited, but the exact reason is unclear. (Torgerson Aff., Ex. 9.) Apparently, Item 17 was subsequently misplaced or lost and MSOP offered to compensate Banks for the Item. (*Id.*)

### k.  Item 25

Banks alleges that in 2011, unknown MSOP staff members confiscated a magazine entitled "Metropolis." (Am. Compl. at ¶ 25.) Banks does not know anything

else about the identity of this Item, what it contained, or why it was seized. (Banks Dep. at 23.) MSOP records indicate that Item 25 was found in another client's room and seized because it was deemed to be contraband. (Torgerson Aff., Ex. 10.) However, the exact reason why it was deemed to be contraband is unclear. (*Id.*)

### l. Item 27

Banks alleges that in 2011, Defendants Collins and Lundgren confiscated an issue of "W" magazine. (Am. Compl. at ¶ 27.) As previously described, "W" is a fashion, art, and culture magazine and Banks believes this issue was at least 120 pages long. (Pl.'s Mem. in Opp. at 13, 19–21.) MSOP records indicate that Item 27 was deemed to be Prohibited because it contained "bare breasts, exposed." (Second Aff. of Amanda ("Second Torgerson Aff.") [Doc. No. 121], Ex. 1 [Doc. No. 121-1].)

### m. Item 29

Banks alleges that in 2011, Defendants Scanlon and Collins confiscated the fall/winter 2009/2010 issue of a catalog entitled "Museum Store." (Am. Compl. at ¶ 29; Banks Dep. at 22–23.) MSOP records indicate that Item 29 was deemed to be Prohibited because it contained "multiple photos of bare breasts." (Torgerson Aff., Ex. 11.)

### n. Item 35

Banks alleges that in 2008, Defendant Dahl confiscated a book entitled "Annie Liebovitz: A Photographer's Life 1990-2005" by Annie Liebovitz. (Am. Compl. at ¶ 35; Banks Dep. at 25.) Banks presents some evidence that this book contains photos and essays by Liebovitz on a variety of personal and professional subjects. (Pl.'s Mem. in Opp. at 37.) MSOP records indicate that Item 35 was deemed to be Prohibited because it

contained numerous nude images, including "images of minor children and adults with clearly visible genitalia." (Torgerson Aff., Ex. 12.) Defendants produced several pages from the book, which contain images of exposed female breasts, visible male genitalia, and infants with their genitals exposed. (Winters Aff., Ex. 7.)

### o.  Item 36

Banks alleges that in 2008, Rebecca Jerome, who is not a named Defendant in this case[7], confiscated a book Banks ordered from the public library entitled "Role Models: Feminine Identity in Contemporary American Photography" by Susan Fisher Sterling and Kathryn Wat. (Am. Compl. at ¶ 36; Banks Dep. at 25.) MSOP records indicate that Item 36 was deemed to be Prohibited because it contained "images of adult females with clearly visible genitals in an explicit fashion, [unreadable] child partially nude posed in sexually suggestive manner, one more partially nude in [unreadable]." (Torgerson Aff., Ex. 13.) Defendants produced several pages from the book, which contain images of exposed female breasts, visible female genitalia, one image of a naked woman suspended from a hay hook, a partially nude minor arguably posed in a suggestive way, and other nude minors. (Winters Aff., Ex. 8.)

### p.  Item 37

Banks alleges that in 2008, Rebecca Jerome and Sara Kulas, who are not named Defendants, confiscated "a Polaroid Picture of stained and ripped linens." (Am. Compl.

---

[7] As described later, Banks attempts to further amend the operative Complaint in part to allege that Defendants Liggett, Lundquist, and Sater were the ones who confiscated Item 36 from him. As described above, Lundquist, Liggett, and Sater were previously dismissed as Defendants from this case.

at ¶ 37; Banks Dep. at 26–28.)  Banks took the picture to prove that his linens arrived in a damaged state.  (Banks Dep. at 26–28.)  MSOP records indicate that Banks was given the option of having a new linen package delivered and that he was compensated for the cost of the photo.  (Torgerson Aff., Ex. 14.)

### q.  Item 38

Banks alleges that in 2009, Defendant Collins and Amanda Hagge, who is not a named Defendant, confiscated a book Banks had requested from the public library entitled "Women" by Annie Liebovitz and Susan Sontag.[8]  (Am. Compl. at ¶ 38.)  Banks presents some evidence that this book contains photos by Liebovitz on a variety of personal and professional subjects, along with an essay by Sontag.  (Pl.'s Mem. in Opp. at 40–41.)  MSOP records indicate that Item 38 was deemed to be Prohibited because it contained numerous nude images, including nude images of minors  (Torgerson Aff., Ex. 15.)  Defendants produced several pages from the book, which contain images of women wearing see-through tops and dresses, exposed female breasts with visible nipples, exposed female genitalia, one image of a fully nude woman bound to a cross, and nude infants (although they do not have their genitals exposed).  (Winters Aff., Ex. 9.)

### B.  Procedural History

Banks brought his suit in 2011.  (*See* Compl. [Doc. No. 1].)  He amended his Complaint several months later.  (*See* Am. Compl.)  In January of 2012, Magistrate Judge

---

[8] As described later, Banks attempts to further amend the operative Complaint in part to allege that Dan Williams and Jared Rock were the ones who confiscated Item 38 from him.  Neither Williams nor Rock was previously named as a Defendant in this case.  The deadline for amending the complaint is long past.  (Am. Pretrial Sch. Order at 2 [Doc. No. 82].)

Keyes[9] issued a Report and Recommendation ("R&R") that recommended dismissing many, but not all, of Banks' claims. (R&R dated 1/13/2012 [Doc. No. 62].) Banks objected to the R&R. (*See* Pl.'s Objs. [Doc. No. 64].) Shortly after Banks filed his objections, this case was stayed for several years pending the resolution of related litigation. (*See* Orders dated 2/6/2012, 10/27/2014, 8/20/2015 [Doc. Nos. 70, 72, 73].) The stay was lifted in March of 2016. (*See* Order dated 3/23/2016 [Doc. No. 76].)

Ultimately, this Court adopted the R&R in its entirety.[10] (Order dated 6/27/2016 [Doc. No. 81].) This left only Banks' claims related to the seizure of Items 4–6, 8–13, 17, 25, 27, 29, and 35–38. (*Id.*) Banks alleges that these seizures violated his First, Fourth, and in some cases Fourteenth Amendment rights, and the Media Policy itself. (*See* Am. Compl. at ¶¶ 4–6, 8–13, 17, 25, 27, 29, and 35–38.) Defendants now move for summary judgment on Banks' remaining claims. (*See* Defs.' Summ. J. Mot.) In conjunction with opposing Defendants' Summary Judgment Motion, Banks also filed a Motion to Amend the Complaint. (*See* Mot. to Am.) Attached to that Motion was a Proposed Second Amended Complaint. (Proposed Second Am. Compl. [Doc. No. 117-1].)

## II. DISCUSSION

### A. Standard of Review

---

[9] Magistrate Judge Keyes has since retired.

[10] Many of Banks' remaining claims, addressed in this Order, are factually and legally indistinguishable from those addressed in the R&R. Thus, the Court relies on the reasoning and analysis of the adopted R&R throughout this Order.

*Pro se* complaints are liberally construed. *See Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004). However, even under this liberal standard, a *pro se* complaint must contain specific facts in support of the claims it advances. *See Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985). Courts do not "assume facts that are not alleged, just because an additional factual allegation would have formed a stronger complaint." *Stone*, 364 F.3d at 915. On summary judgment, the Court views the facts in the light most favorable to the nonmoving party, but that party "may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007).

### B.  The Seizures and Banks' First Amendments Rights

Defendants argue that summary judgment should be granted as to Banks' First Amendment claims because the Items were seized pursuant to legitimate therapeutic and institutional security concerns. (*See* Defs.' Mem. in Supp. at 11–16.) Specifically, they contend that preventing nude images from entering MSOP—outside certain strictly monitored settings—is crucial to providing clients with effective therapy and preserving institutional security for clients and staff alike. (*Id.* at 12.) Banks argues that none of these seizures were valid, or that issues of disputed material fact about the validity and reasonableness of the seizures preclude summary judgment. (*See* Pl.'s Mem. in Opp. at 3–47.) The crux of Banks' opposition is that the seized Items contained images of "mere nudity" (i.e., were not pornographic or sexually explicit) and could not be properly classified as Prohibited under the Media Policy. (*See id.* at 3–5, 10–13.) Banks also contends that MSOP's therapeutic and institutional security concerns are not advanced by

prohibiting items containing mere nudity and that these concerns are otherwise overstated or unwarranted. (*See id.* at 5–10.)

When considering the constitutionality of restrictions placed on prisoners' First Amendment rights, courts employ a test first set forth in *Turner v. Safley*, 482 U.S. 78 (1987). The ultimate objective of the *Turner* test is to determine whether the challenged action/restriction "is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. If it is, then the action/restriction passes constitutional muster. *Id.*

> When making the *Turner* determination, courts consider four factors:
>
> 1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; (4) and whether there exist alternatives to accommodate the prisoner with a de minimis cost.

*Murchison v. Rogers*, 779 F.3d 882, 887 (8th Cir. 2015). Banks bears the burden of proving that the *Turner* factors weigh in his favor. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden, moreover, is not on the State to prove the validity of prison regulations [under *Turner*] but on the prisoner to disprove it."); *Banks v. Ludeman*, No. 08-cv-5792 (MJD/JJK), 2010 WL 4822892, at *10 (D. Minn. Oct. 4, 2010) (hereinafter, *Banks I*), *report and recommendation adopted,* No. 08-cv-5792 (MJD/JJK), 2010 WL 4822888 (D. Minn. Nov. 22, 2010).[11]

---

[11] Banks previously brought a separate suit against various MSOP staffers related to the seizure of other items pursuant to the Media Policy. *See Banks I*, 2010 WL 4822892 at *4. The vast majority of those claims were dismissed because the seizures were valid and

Civilly committed persons in MSOP, like Banks, have liberty interests that are "considerably less than those held by members of free society" but are "entitled to more considerate treatment and conditions of confinement" than prisoners. Senty-Haugen v. Goodno, 462 F.3d 876, 886 (8th Cir. 2006) (quotations omitted); see also Revels v. Vincenz, 382 F.3d 870, 874 (8th Cir. 2004) ("Although an involuntarily committed patient of a state hospital is not a prisoner per se, his confinement is subject to the same safety and security concerns as that of a prisoner."). Thus, courts in this District employ a "modified" version of the *Turner* test wherein they consider whether MSOP's regulation/restriction is reasonably related to "legitimate therapeutic or institutional interests." *Ivey*, 2008 WL 4527792 at *6; see *Banks v. Jesson*, No. 11-cv-1706 (SRN/JSM), 2016 WL 3566207, at *7 (D. Minn. June 27, 2016) (employing the modified *Turner* analysis when adopting the R&R in this case) (hereinafter, *Banks II*); *Karsjens v. Jesson*, 6 F. Supp. 3d 916, 937 (D. Minn. 2014) (collecting cases employing the modified *Turner* analysis when considering restrictions on the constitutional rights of those confined in non-prison settings like MSOP and state-run mental hospitals). The rehabilitation of sex offenders and institutional security of MSOP are legitimate government interests under *Turner*. *Banks II*, 2016 WL 3566207 at *8; *Banks I*, 2010 WL 4822892 at *10; *Ivey*, 2008 WL 4527792 at *5; see *Waterman v. Farmer*, 183 F.3d 208, 215 (3d Cir. 1999) ("[I]t is beyond dispute that New Jersey has a legitimate penological interest in rehabilitating its most dangerous and compulsive sex offenders.").

---

reasonable as a matter of law. *See id.* at *7–17. The remaining claims were resolved by a settlement between the parties. (*See* Figueroa Aff., Ex. A at 1–4 [Doc. No. 19-2].)

Banks' First Amendment claims suffer from at least two fatal flaws. First, MSOP's restriction on Banks possessing nude images—as applied through the seizure of the Items—satisfies the *Turner* test, serving legitimate therapeutic and security interests, and is therefore constitutional. Second, even if Banks' First Amendment claims turned solely on whether Defendants accurately classified the seized Items as Prohibited under the Media Policy—which they do not—Defendants in fact properly classified the Items.

### 1. The *Turner* Test

Inherent in Banks' arguments is the assumption that if the seized Items were not properly classified as Prohibited under the Media Policy, this fact alone would mean that their seizure violated his First Amendment rights. However, "violating an internal policy does not *ipso facto* violate the Constitution . . . ." *Walton v. Dawson*, 752 F.3d 1109, 1122 (8th Cir. 2014); *see Elliott v. Wilson*, No. 015-cv-01908 (JNE/KMM), 2017 WL 1185213, at *18 (D. Minn. Jan. 17, 2017), *report and recommendation adopted sub nom.*, No. 15-cv-1908 (JNE/KMM), 2017 WL 1180422 (D. Minn. Mar. 29, 2017) ("[A]llegations that prison staff have violated internal policies do not, by themselves, establish a claim of constitutional dimension."). Instead, the issue is whether the seizure of the Items was valid according to the *Turner* test. *See Bornstein v. Monmouth Cty. Sheriff's Office*, 658 F. App'x 663, 668 (3d Cir. 2016) ("[T]he issue is not whether they violated internal prison policies but whether they violated the Constitution."). Moreover, as discussed below, the seized Items in fact contained images that were properly classified as Prohibited under the Media Policy.

MSOP's limitations on the media items Banks could possess and Defendants' related seizures satisfy the *Turner* test. Preventing Banks from possessing items that contain even "mere nudity" was reasonably related to MSOP's legitimate interests in providing a therapeutic environment for Banks and other clients, as well as ensuring facility security. As Defendants explain, tightly controlling nude images in MSOP is important because these images can trigger client relapses, may be otherwise antithetical to client treatment, are often traded or otherwise disseminated amongst the clients, and may serve as the basis for abusive or disruptive behavior against clients and staff alike. (Hébert Aff. at ¶¶ 5–6.) Numerous other courts have reached the same conclusion. *Semler v. Ludeman*, No. 09-cv-0732 (ADM/SRN), 2010 WL 145275, at *10 (D. Minn. Jan. 8, 2010) (upholding MSOP's use of the Media Policy to prohibit photographs of "nude female breasts and full-frontal genitalia"); *Banks I*, 2010 WL 4822892 at *10 (upholding MSOP's prohibition on clients displaying images of "nude females"); *Banks II*, 2016 WL 3566207 at *8 (upholding MSOP's prohibition on Banks possessing items that depicted "nudity and visible genitals"); *see Waterman*, 183 F.3d at 211–19 (holding that statutes and regulations prohibiting prisoners housed in a sex offender complex from possessing sexually oriented material, including images of exposed genitals or female breasts, were constitutionally valid under *Turner*); *Josselyn v. Dennehy*, 333 F. App'x 581 (1st Cir. 2009) (upholding a regulation that prohibited prisoners from possessing publications that featured nudity using the *Turner* test); *Mauro v. Arpaio*, 188 F.3d 1054 (9th Cir. 1999) (holding that a policy prohibiting inmates from possessing sexually

explicit material, including materials containing frontal nudity, was constitutionally valid under *Turner*).

Banks' attempts to dispute that prohibiting him from possessing nude images will in fact serve MSOP's therapeutic or security interests are beside the point. (*See* Pl.'s Mem. in Opp. at 5–10.) The sole issue is whether MSOP's restrictions on Banks' access to the seized Items were reasonably related to its legitimate interests, a determination that does not require factual findings that the regulations in fact serve their intended purposes. *Josselyn*, 333 F. App'x at 585; *see Mauro*, 188 F.3d at 1060 ("The only question that we must answer is whether the defendants' judgment was 'rational,' that is, whether defendants might reasonably have thought that the policy would advance its interests."); *Turner*, 482 U.S. at 93, n.*. Moreover, the Court must afford deference to MSOP's assessment regarding the importance of the restrictions to advancing its therapeutic and security interests. *See Murchison*, 779 F.3d at 887; *Goff v. Graves*, 362 F.3d 543, 549 (8th Cir. 2004). Even if the Court were to consider these challenges to the effectiveness of MSOP's restrictions, Magistrate Judge Keyes' earlier finding remains true:

> Plaintiff has not come forward with anything to rebut the sensible proposition that displaying images of nude females with visible genitals or breasts and nude children to sex offenders is detrimental to a sex offender's rehabilitation, and inimical to institutional security, and thus it is reasonable to restrict such displays.

(R&R at 17–18.) *See Waterman*, 183 F.3d at 217 (holding that "common sense" dictates that prohibiting prisoners from having pornography and other sexually explicit materials aids rehabilitation and security interests).

The Court is careful to emphasize the importance of the circumstances surrounding the seizures and restrictions in this case. The Prohibited images contained within the seized Items might be innocent, artistic, or innocuous when viewed in the context of "normal" society. However, the circumstances here are far from normal. MSOP is a facility that exclusively houses dangerous sex offenders who are in varying stages of treatment. *See supra* Part I.A.1. Banks is a civilly committed sexually dangerous person who has steadfastly refused to engage with treatment and been regularly abusive and disruptive towards MSOP staff and clients. *See supra* Part I.A.2. In fact, because of this behavior, Banks resides in a special unit meant to address—as best it can—clients' problematic behavior while minimizing the negative effects of such behavior on other clients and staff members. *Id.* Under these circumstances, prohibiting Banks from possessing images that contain even "mere nudity" (i.e., exposed female breasts, visible genitalia, or partially nude children not depicted in a pornographic or sexually explicit manner) is reasonably related to MSOP's therapeutic and security interests.[12] *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) ("[P]rison officials may well conclude that certain [media items], though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison.").

---

[12] The Court does not suggest that MSOP may, as a general proposition, prohibit all clients from possessing any item containing nudity of any kind. *See Ivey*, 2008 WL 4527792 at *9, 12 (noting that the Media Policy did not ban all images containing nudity, as evidenced by the fact that photos of naked female buttocks and cleavage were returned to a client). MSOP apparently agrees that even its restrictions on Banks do not reach so broadly, as evidenced by the fact that it deemed an image of a nude female with exposed breasts, but no visible nipple, to be Counter-Therapeutic rather than Prohibited. *See supra* Part I.A.3.g.

Neither Defendants nor Banks meaningfully address the last three elements of the *Turner* test in their briefing. Regardless, the Court has considered these factors and holds that they favor finding that Defendants' seizures of the Items were constitutionally permissible for the reasons previously stated in the adopted R&R. (R&R at 19–21.)

### 2. The Media Policy

The vast majority of Banks' opposition argues that the seized Items were not accurately classified as Prohibited under the Media Policy. (*See* Pl.'s Mem. in Opp. at 10–47.) Specifically, Banks contends that the nude images in these Items were not the sort prohibited by the Media Policy, especially considering that these images made up a small fraction of the Item's overall content (i.e., that the Media Policy must be applied to each Item "as a whole"). (*See id.*)

As just described, the Media Policy alone does not define the contours of Banks' First Amendment rights within MSOP. However, even if the "accurate" application of the Media Policy controlled the result here—it does not—Defendants properly classified the seized items as Prohibited under that Policy.

Items 35, 36, and 37 all contain images of nude children, some with their genitals visible and at least one with the child arguably posed in a sexually suggestive manner.[13] (*See* Media Policy at 2 (prohibiting "[a]ny pictures, including pictures in reading

---

[13] Banks argues that these images do not meet the "lasciviousness" test for child nudity. (*See* Pl.'s Mem. in Opp. at 11–12.) This test is used to assess whether images or materials qualify as child pornography for the purposes of a criminal conviction on child pornography-related charges. *See United States v. Wallenfang*, 568 F.3d 649, 656–57 (8th Cir. 2009). Banks offers no support, nor can the Court find any, for the proposition that the lasciviousness test has any bearing on the constitutionality of restrictions placed on a civilly committed sex offender's access to images of nude children.

materials, or videos of full or partially nude minor children with visible genitals" and "[a]ny pictures, including pictures in reading materials, or videos of the unclothed or clothed figure of a minor child posing in a sexually suggestive posture of sexual manner").) Items 36 and 38 contain images that arguably depict the sadomasochistic restraint of nude females with their breasts and/or genitals fully exposed. (*See id.* (prohibiting "[a]ny pictures, including pictures in reading materials, or videos showing close-up depictions of . . . . sadomasochistic abuse").) Items 4, 8, 35, 36, and 38 contain images of clearly visible adult genitalia. (*See id.* (prohibiting "[a]ny pictures, including pictures in reading materials, or videos showing close-up depictions of . . . human genitalia in a lewd and explicit fashion").) Items 5, 6, 8–10, 12, 13, 27, 29, 35, 36, and 38 all contain images of nude females, including fully exposed breasts with visible nipples. (*See id.* (prohibiting "[p]ictures, videos or reading materials that, . . . taken as a whole, predominantly and prominently display nudity, and have the primary purpose of sexual arousal, in a manner similar to adult oriented sexual magazines").)

Banks argues that these images, which are contained in fashion magazines, photo journals, or other arguably artistic works, simply cannot be classified as sexually explicit, obscene, or intended to cause sexual arousal. However, again, the context in which these images are viewed matters a great deal. An average individual viewing these images in the context of normal society might find them to be artistic, or simply innocuous, and not sexually arousing or provocative. But the circumstances here—involving a civilly committed sex offender who refuses treatment housed in a facility with other sex offenders in varying stages of treatment—are markedly different.

Tellingly, Banks does not request that any of the seized Items be returned to him with the Prohibited images removed or redacted.[14] This suggests that he wants access to the Items precisely because they contain the Prohibited images and because he finds those images to be sexually arousing. It is reasonable to assume that other clients in MSOP would feel the same way and thus viewing these images could derail their treatment or cause them to lash out at other clients or MSOP staff. (*See* Hébert Aff. at ¶¶ 5–6.)

In conclusion, Defendants' seizure of Items 4–6, 8–10, 12, 13, 27, 29, 35, 36, and 38 complied with the Media Policy, were reasonably related to MSOP's legitimate therapeutic and security interests, and thus did not violate Banks' First Amendment rights.

### C. The Seizures and Banks' Fourth and Fourteenth Amendment Rights

Banks alleges that Defendants' seizure of the Items violated his Fourth Amendment rights. However, the Fourth Amendment proscribes only *unreasonable* searches and seizures. *Banks I*, 2010 WL 4822892 at *13.

> Given the prohibited nature of the above items, it was not unreasonable for MSOP officials to remove these materials from the MSOP patient population. No reasonable factfinder could conclude that it is

---

[14] The Court does not suggest that if Banks were to make such a request, MSOP would be constitutionally required to honor it. *See Mauro*, 188 F.3d at 1060, n.4 ("That the jail policy may exclude artistic or scientific journals does not render the policy unconstitutionally overbroad. … Rather, as long as the regulation withstands the *Turner* reasonableness test, it will be deemed constitutional."). The Court notes that in some instances—like where the Item in question is a book from the public library—redaction or removal of Prohibited images may not be possible. Regardless, the issue of whether Banks is constitutionally entitled to some media items with the Prohibited images removed or redacted is not before the Court.

"unreasonable" to seize such sexually explicit photographs from a civilly-committed sex offender who is confined, in company with other sex offenders, in an institution that is supposed to provide rehabilitative treatment.

(R&R at 22.) Again, this Court agrees with Magistrate Judge Keyes' prior well-reasoned opinion and holds that the seizure of Items 4–6, 8–10, 12, 13, 27, 29, 35, 36, and 38 did not violate Banks' Fourth Amendment rights.

Banks further alleges that the seizure of some, but not all, of the Items violated his Fourteenth Amendment right to due process. (Am. Compl. at ¶¶ 5, 10, 17, 25, 27, 29, 35–38.) Banks provides no factual details regarding how his right to due process was impugned by the seizures. At most, Banks states that he intended his Fourteenth Amendment claims to reflect his opinion that MSOP's process for clients to appeal the seizure of media items is insufficient. (Banks Dep. at 46–47.) The failure to provide some factual support for his due process claims justifies dismissing them. *See Stone*, 364 F.3d at 915. However, even considering the limited merits of these claims, the Court holds that they fail as a matter of law for the same reasons as previously stated by Magistrate Judge Keyes. (R&R at 22–24.)

### D. Items 11, 17, 25, and 37

Banks' claims related to Items 11, 17, 25, and 37 are somewhat different than his others. (Am. Compl. at ¶¶ 11, 17, 25, 37.) Item 11 was initially deemed to be Prohibited, but upon subsequent review was re-classified as Counter-Therapeutic, and MSOP records indicate that it was returned to Banks. *See supra* Part I.A.3.g. However, Banks claims that Item 11 was never returned to him. *Id.* There is no evidence that any Defendant

purposely deprived Banks of Item 11 after its re-classification, or intentionally destroyed that Item, and the inadvertent loss or destruction of Banks' property does not amount to a violation of his constitutional rights.  (R&R at 31–32.)  Similarly, Item 17 was inadvertently lost or destroyed before Banks was given the opportunity to dispose of it according to the Media Policy.  *See supra* Part I.A.3.j.  Again, the inadvertent destruction of Item 17 does not constitute a violation of Banks' constitutional rights.[15]  (R&R at 31–32.)

Item 25 consisted of a magazine belonging to Banks that was seized while in another client's possession.  *See supra* Part I.A.3.k.  MSOP's records do not indicate why Item 25 was deemed to be contraband, but Banks also has no information about what the magazine was or what it contained.  Banks' failure to provide any factual support for his claims related to Item 25 warrants their dismissal.[16]

Item 37 was a picture of dirty and ripped linens that was confiscated from Banks and subsequently destroyed.  *See supra* Part I.A.3.p.  The evidence indicates that Banks was given the option to receive new linens and was compensated for the cost of the photo.  *Id.*  Moreover, Banks appears to have abandoned his claims related to Item 37, proposing that they be dismissed.  (*See* Proposed Second Am. Compl. at ¶ 37.)  Thus, the Court dismisses these claims.

---

[15] Tellingly, Banks proposes dismissing his claims related to Item 17.  (Proposed Second Am. Compl. at ¶ 17.)

[16] Banks also proposes dismissing his claims related to Item 25.  (Proposed Second Am. Compl. at ¶ 25.)

### E. Qualified Immunity and Res Judicata

Defendants contend that qualified immunity and res judicata provide independent bases to dismiss Banks' claims. (Defs.' Mem. in Supp. at 19–23.) They also argue that Banks failed to establish the requisite factual basis to allow his request for punitive damages to proceed. (*Id.* at 23–25.) Since the Court holds that Banks' remaining claims are insufficient as a matter of law, it declines to address these arguments.

### F. Banks' Motion to Amend

In opposing Defendants' Summary Judgment Motion, Banks also filed a Motion to Amend the Complaint. (*See* Mot. to Am.) Banks did not seek the Court's permission to file the Motion to Amend, nor did he obtain Defendants' consent. Moreover, Banks filed his Motion more than two months after the Scheduling Order's deadline for nondispositive motions had passed. (*See* Am. Pretrial Sch. Order at 2 [Doc. No. 82].)

Banks' only explanation for the belated nature of his Motion is that he is a pro se litigant with limited legal knowledge. (*See* Mot. to Am. at 1.) He also argues that Defendants are not prejudiced by his proposed amendments because: (1) "[t]he legal arguments asserted by the Defendants in their present Second Motion for Summary Judgment would remain the same" and, (2) Banks proposes dismissing his claims related to Items 17, 25, and 37, which benefits Defendants. (*Id.* at 2.)

Banks' Motion must be denied for at least three reasons. First, because his Motion comes well after the deadline set in the Scheduling Order, Rule 16's more demanding good cause standard applies. *See* Fed. R. Civ. P. 16(b)(4); *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716 (8th Cir. 2008) ("When a party seeks to amend a pleading after

the scheduling deadline for doing so, the application of Rule 16(b)'s good-cause standard is not optional. To permit district courts to consider motions to amend pleadings under Rule 15(a) without regard to Rule 16(b) would render scheduling orders meaningless and effectively [] read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." (quotations omitted)).

> The primary measure of good cause is the movant's diligence in attempting to meet the [scheduling] order's requirements. While the prejudice to the nonmovant resulting from modification of the scheduling order may also be a relevant factor, generally, we will not consider prejudice if the movant has not been diligent in meeting the scheduling order's deadlines.

*Sherman*, 532 F.3d at 716–17 (quotations and citations omitted). The good cause standard is "exacting" and demands that despite the moving party's diligence, the amendment could not reasonably have been brought within the timeframe set by the scheduling order. *Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minnesota*, 187 F.R.D. 578, 581–82 (D. Minn. 1999). "It hardly bears mention, therefore, that 'carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.'" *Id.* at 582 (quoting *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)). Banks provides no explanation for the belated nature of his Motion and thus fails to meet the exacting good cause standard under Rule 16.

Second, Banks failed to comply with the procedural requirements that he seek the Court's leave to file the Motion and provide a redlined copy showing his proposed changes. *See* Fed. R. Civ. P. 15(a)(2); D. Minn. L.R. 15.1(b). All litigants, even those who are *pro se*, are required to follow the applicable procedural rules. *See Brown v. Frey*, 806 F.2d 801, 804 (8th Cir. 1986) ("Pro se litigants are not excused from

compliance with substantive and procedural law . . . ."); *Settlemire v. Watson*, 877 F.2d 13, 14 (8th Cir. 1989) (dismissal of a *pro se* litigant's claims without prejudice is appropriate where the litigant failed to abide by procedural rules and the court's orders). Banks' failure to follow these rules warrants denying his Motion. *See Settlemire*, 877 F.2d at 14; *Abdi v. Garbisch*, No. 12-cv-306 (JNE/JJG), 2013 WL 4829191, at *4 (D. Minn. Sept. 10, 2013) (dismissing a *pro se* litigant's claims without prejudice for failure to comply with the procedural rules).

Third, even if the Court were to consider the merits of Banks' Motion under Rule 15's more lenient amendment standard, the Motion fails due to futility. *See Geier v. Missouri Ethics Comm'n*, 715 F.3d 674, 678 (8th Cir. 2013) (holding that a proposed amendment is properly denied where it is futile). A proposed amended complaint is futile if it "could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure . . . ." *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008). Put another way, where the proposed amendment fails to state a claim, it is futile and thus properly denied. *U.S. ex rel. Gaudineer & Comito, L.L.P. v. Iowa*, 269 F.3d 932, 936 (8th Cir. 2001).

Banks' proposed amendments do not contain any substantive allegations that were not already in the record and considered by the Court, a fact that Banks appears to acknowledge. (*See* Mot. to Am. at 2.) The essence of his proposed amendments is to identify additional MSOP staffers who may have also been involved with the seizures at issue in this Order. For the reasons discussed above, Banks' claims fail as a matter of law, and this conclusion would not change if this amendment were allowed. Thus,

Banks' proposed amendments would not survive a motion to dismiss and his Motion is futile.

## III. ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion to Amend [Doc. No. 117] is **DENIED**.

2. Defendants' Motion for Summary Judgment [Doc. No. 106] is **GRANTED** as follows:

   a. Paragraphs ¶¶ 4–6, 8–13, 17, 25, 27, 29, and 35–38 of the Amended Complaint [Doc. No. 57] are **DISMISSED WITH PREJUDICE**;

   b. This Order, in conjunction with the Court's previous order dated June 27, 2016 [Doc. No. 81], disposes of all of Plaintiffs' claims against Defendants.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 8, 2017                              s/ Susan Richard Nelson
                                                SUSAN RICHARD NELSON
                                                United States District Judge